Versión para imprimir

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lillian Ortiz Alvarado, William Alvarado Vázquez y la Sociedad Legal de Gananci a l e s Compuesta entre ambos<br><br>    Recurridos<br><br>        v.<br><br>Great American Life Assurance Company of PR, et als<br><br>    Recurridos<br><br>Estado Libre Asociado de Puerto Rico, Departamento de Salud y el Fondo de Enfermedades Catastróficas Remediables<br><br>    Peticionario    - Interventor | Certiorari<br><br>2011 TSPR 79<br><br>182 DPR _____ |

Número del Caso:  CC      - 2009 - 1086

Fecha: 3 de junio de 2011

Tribunal de Apelaciones:

Región Judicial de Aibonito, Panel IX

Jueza Ponente:

Hon. Marí      a del C. Gómez Córdova

Oficina de la Procuradora General:

Lcda. Lizzette Mejías Avilés
Procuradora General Auxiliar

Abogado de la Parte Recurrida:

Lcdo. José Antonio Soto Ríos

Materia:     Incumplimiento de Contrato

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a                    la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lillian Ortiz Alvarado, William Alvarado Vázquez y la Sociedad Legal de Gananciales compuesta entre ambos<br><br>Recurridos<br><br>v.<br><br>Great American Life Assurance Company of PR, et als<br><br>Recurridos<br><br>Estado Libre Asociado de Puerto Rico, Departamento de Salud y el Fondo de Enfermedades Catastróficas Remediables<br><br>Peticionario-Interventor | CC-2009-1086 |

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES.

En San Juan, Puerto Rico, a 3 de junio de 2011.

Se nos solicita la revisión de una sentencia del Tribunal de Apelaciones, Región Judicial de Aibonito, que dispuso que no procedía la subrogación del Fondo para Servicios contra Enfermedades Catastróficas Remediables (Fondo) en una reclamación de un asegurado a su aseguradora. Señaló el foro apelativo intermedio que como el contrato de seguros se otorgó entre la compañía aseguradora y el asegurado, y el Fondo no era parte del contrato, no procedía obligar a la aseguradora al

cumplimiento de una obligación con el Fondo porque éste era un tercero.

Por consiguiente, este recurso nos permite resolver, primero, si procede que la compañía de seguros Great American Life Assurance of P.R. (Great American) responda por los gastos incurridos en el trasplante de hígado del Sr. William Alvarado Vázquez de acuerdo con la póliza de seguro expedida a favor de la Sra. Lillian Ortiz Alvarado en la que el señor Alvarado Vázquez figuraba como beneficiario. Segundo, nos corresponde determinar si procede la nulidad del donativo hecho por el Fondo a favor del señor Alvarado Vázquez, ante la omisión de informar que este último tenía una póliza de seguro a su favor. Evaluadas estas interrogantes, resolvemos ambas preguntas en la afirmativa.

I

En el 2002 la señora Ortiz Alvarado completó y firmó una póliza familiar de seguro de cáncer y enfermedades perniciosas con la compañía aseguradora Great American. Esta póliza funciona por medio de reembolso, es decir, el asegurado sufraga los costos inicialmente y luego la aseguradora reembolsa conforme a los recibos suministrados. Como parte del contrato, la señora Ortiz Alvarado solicitó, además, suplementos o endosos de cuidado intensivo, muerte y tratamiento médico de emergencias debido a accidentes y suplemento para

<u>trasplante de órganos.</u>[1] Como asegurados, figuraban la señora Ortiz Alvarado y su esposo, el señor Alvarado Vázquez.

Pasados unos años, tras un diagnóstico de enfermedad crónica del hígado, al señor Alvarado Vázquez le recomendaron someterse a una operación de trasplante de hígado. Por consiguiente, la señora Ortiz Alvarado solicitó asistencia económica del Fondo para costear los gastos del trasplante de hígado de su esposo. Sin embargo, a pesar de que en la solicitud el Fondo requería a los solicitantes revelar si contaban con cualquier póliza de seguro, éstos nunca informaron que poseían una con Great American. Por tanto, luego de evaluar y ponderar toda la información económica y médica del señor Alvarado Vázquez y sus familiares, el Fondo aprobó la ayuda para el trasplante de hígado del señor Alvarado Vázquez como un donativo.

Obra en el expediente que el Fondo emitió un cheque a favor del *Methodist University Healthcare Hospital* por $207,000. Posteriormente Alvarado Vázquez fue ingresado en el *Methodist University Healthcare Hospital* de Tennessee y recibió con éxito su trasplante de hígado.

No obstante, una vez culminada la operación, la señora Ortiz Alvarado y su esposo procedieron a solicitar

---

[1] "Los endosos son acuerdos por escrito que se adhieren a la póliza para que formen parte del contrato con el propósito de alterar, ampliar o restringir la cubierta que dispone la póliza". R. Cruz, R. Cruz, *Derecho de Seguros*, San Juan, Ed. JTS, 1999, pág. 368.

a Great American el reembolso de los gastos de cuidado médico y tratamiento. Sin embargo, Great American, conforme a los recibos y facturas presentadas, pagó únicamente por los servicios de cuidado intensivo, servicio de cuidado por enfermera privada, transportación aérea y hospedaje. En cuanto a los demás gastos, justificó su denegatoria en la ausencia de recibos o facturas de pagos que corroboraran que los asegurados incurrieron en esos gastos. Entienden que como el Fondo fue el que "incurrió" en esos gastos, no les corresponde reembolsar esas partidas.

Específicamente, Great American sostiene su denegatoria en lo dispuesto en el "Suplemento Beneficio por Tratamiento y Servicios Médicos Hospitalarios Incurridos durante Trasplante de Órganos", el cual dispone en su tercer párrafo que

> se pagarán por **gastos incurridos** por cuidado médico y tratamiento del asegurado, y de miembros de su familia si se ha solicitado cubierta familiar, por servicios y materiales suministrados relacionados con un trasplante cubiertos por esta Póliza. Dichos gastos tienen que haber sido incurridos en un Hospital que esté equipado y autorizado para hacer estos trasplantes (de aquí en adelante descrito como 'Centro de Trasplante') y durante un Período de Trasplante según definido.

Inconformes, el 11 de julio de 2007 la señora Ortiz Alvarado y el señor Alvarado Vázquez, por sí y en representación de la sociedad legal de gananciales compuesta entre ambos, presentaron una demanda sobre incumplimiento de contrato contra la aseguradora Great

American. Alegaron que la póliza de seguro adquirida con Great American tenía cubierta familiar y que, entre otras cosas, cubría trasplante de órganos.

Así las cosas, durante la vista inicial salió a relucir que el matrimonio Alvarado-Ortiz no había incurrido en gasto alguno durante el trasplante de órgano, ya que la entidad que pagó el costo del trasplante fue el Fondo. No obstante, los demandantes argumentaron que el inicio de la reclamación contra Great American había sido con el único propósito de devolverle al Fondo la cantidad invertida en el trasplante de hígado del señor Alvarado Vázquez. Argumentaron, a su vez, que habían firmado un compromiso con el Fondo que les obligaba a devolverle toda cantidad de dinero que recibieran de cualquier fuente. *Apéndice del recurso*, pág. 129. Ante esa situación, el Tribunal de Primera Instancia determinó que era el Fondo la parte llamada a hacer el reclamo en el foro judicial y concedió un término de sesenta (60) días para informar las acciones a seguir.

Así las cosas, el Estado Libre Asociado de Puerto Rico (Departamento de Salud y el Fondo), presentó una solicitud de intervención, a la cual se opuso Great American. El foro primario declaró con lugar la intervención. En una vista posterior, las partes anunciaron al Tribunal de Primera Instancia que concurrían en que se trataba de cuestiones de estricto derecho, por lo que solicitarían que se dictara una

sentencia sumaria. El Estado presentó su moción de sentencia sumaria. En ella afirmó que, como el señor Alvarado Vázquez tenía una póliza de seguro, parte del dinero que el Fondo le facilitó fue en realidad un préstamo. Asimismo, indicó que cuando la señora Ortiz Alvarado firmó la petición de asistencia económica y la carta de otorgación de fondos, dio su consentimiento al tercero (Fondo) para que pagara su deuda y optare por la subrogación. Great American presentó su oposición y, a su vez, solicitó que se dictara sentencia sumaria a su favor.

El Tribunal de Primera Instancia emitió sentencia sumaria. En ésta declaró con lugar la solicitud del Estado como interventor en el pleito y ordenó a la aseguradora que cumpliera la obligación que contrajo y pagara al Fondo la cantidad de $150,000 establecida en la póliza para sufragar el costo del trasplante de órgano del señor Alvarado Vázquez. En su razonamiento, el Tribunal de Primera Instancia determinó que la parte demandante (el matrimonio Alvarado-Ortiz) era deudora del Fondo pero a la vez acreedora de la aseguradora (Great American). Por tanto, como el Fondo pagó por el trasplante, tiene ahora la potestad de subrogarse en los derechos del matrimonio asegurado, con el objetivo de recuperar el dinero invertido en el trasplante. De igual forma, el foro primario razonó que como la ley permite el recobro de dinero de cualquier persona jurídica, no

excluye la posibilidad de que el Fondo recobre de una compañía que expidió una póliza de seguros individual.

Insatisfechos con esa determinación, Great American apeló. Tras los trámites de rigor, el foro intermedio revocó. Consideró que no procedía la subrogación del Fondo en una reclamación de un asegurado a su aseguradora. Razonó que ya que el contrato de seguros obliga únicamente al matrimonio y su aseguradora, no procedía obligar a Great American al cumplimiento de la póliza de seguro con un tercero (el Fondo). Resolvió que solo el matrimonio Alvarado-Ortiz podía exigir a la aseguradora cumplir con los términos de su póliza, una vez evidenciaran los gastos en los que incurrieron para sufragar el trasplante.

El Tribunal de Apelaciones dispuso que el Fondo no le otorgó un préstamo a los demandantes para cubrir los gastos del trasplante de hígado, ya que del expediente no se desprendía la existencia de pagaré alguno, carta de cobro o plan de pago. Por ello, el foro apelativo intermedio dispuso que el Fondo podía iniciar una reclamación contra el matrimonio Alvarado-Ortiz a los fines de anular por dolo la suma otorgada y recobrar el dinero invertido.

De dicha sentencia, el Estado acudió ante este Foro, mediante un recurso de *certiorari* acompañado de una moción en auxilio de nuestra jurisdicción. En la moción, el Estado nos solicitó que ordenáramos la paralización de una vista en la que el foro primario pretendía la

reapertura y la continuación de los procedimientos de conformidad con la sentencia emitida por el Tribunal de Apelaciones, aunque ésta no era final y firme. Ante ese cuadro procesal, expedimos el auto y ordenamos la paralización de los procedimientos. Con el beneficio de los argumentos de las partes, procedemos a resolver.

II

En vista de que la presente controversia involucra al Fondo Para Servicios contra Enfermedades Catastróficas Remediables, evaluaremos, inicialmente, el origen y los propósitos de esa entidad.

El Gobierno de Puerto Rico reconoce como parte de su política pública que "la salud del ser humano es elemento fundamental para el disfrute cabal de sus derechos naturales y civiles; principalmente el derecho a la vida". Art. 2 de la Ley Núm. 150, 24 L.P.R.A. sec. 3221, nota. Ello se debe a que "la atención médica y la asistencia económica para estos pacientes revisten un asunto de interés público de la más alta prioridad para el Gobierno de Puerto Rico". Íd.

Cónsono con lo anterior, se creó por ley en 1973 el Fondo de Tratamiento Médico de Emergencia para Pacientes Indigentes. Ese fondo tenía el propósito de ofrecer ayuda a pacientes necesitados que debido a su condición socioeconómica, no tenían acceso a avances modernos de la medicina.

En 1979 el Gobierno de Puerto Rico aprobó un primer fondo con una asignación especial de $200,000 para tratar

enfermedades catastróficas. Luego, en 1993 y 1996, se aumentó la asignación a $500,000 y $3,500,000 respectivamente. Sin embargo, no fue hasta 1996 que la Asamblea Legislativa decidió plasmar formalmente en una legislación la necesidad de atender esta situación. A esos efectos se aprobó la Ley Núm. 150, supra, que creó el Fondo para Servicios contra Enfermedades Catastróficas Remediables. La aprobación de este Fondo tuvo el loable propósito de socorrer económicamente a personas de escasos recursos en la obtención de tratamientos médicos para enfermedades catastróficas remediables. De esta forma se logra proteger la salud y la vida de los residentes de Puerto Rico.

Ahora bien, "las obligaciones del Estado con los derechos fundamentales de sus ciudadanos... no son ilimitados. Dependen, pues, de la disponibilidad de los recursos y del uso razonable y efectivo de los mismos". Exposición de Motivos de la Ley Núm. 150, supra. Sin embargo, a pesar de las dificultades económicas que atraviesa el Gobierno de Puerto Rico, entre sus propósitos está el que

> [n]ingún ciudadano que padezca una enfermedad catastrófica debe perder la vida por razones de limitación económica cuando la ciencia médica ha evidenciado con éxito el tratamiento que puede remediar la enfermedad al extremo de salvar su vida; cuando dicho tratamiento, incluyendo su diagnóstico no es cubierto por los planes de salud disponibles en el mercado general, incluyendo el Plan de Seguro de Salud del Gobierno de Puerto Rico y cuando el paciente o los integrantes de su núcleo familiar carecen de los recursos económicos para asumir los costos o carecen de los medios

para obtener financiamiento en la banca privada.

Art. 2 de la Ley Núm. 150, supra.

Por ello, se dispuso expresamente que el Gobierno de Puerto Rico sufrague o financie, total o parcialmente, los costos del diagnóstico y tratamiento, incluyendo los gastos supletorios de los pacientes que cumplan con las disposiciones de la ley y con la reglamentación aplicable.[2] Esa ayuda, se facilitará en concepto de

---

[2] La Ley define una enfermedad catastrófica remediable como:

"(a)(1)   ...—Enfermedad cuyo efecto previsible, certificado por un médico, es la pérdida de la vida; para la cual la ciencia médica ha evidenciado con éxito que hay tratamiento que remedia dicha condición al extremo de salvar la vida del paciente; que ese tratamiento, incluyendo su diagnóstico no sea cubierto o que sea cubierto parcialmente por los planes de seguro de salud disponibles en el mercado general, incluyendo el Plan de Seguro de Salud del Gobierno de Puerto Rico; y que el paciente o los integrantes de su núcleo familiar o los obligados por ley a alimentar carecen de los recursos económicos para asumir los costos o los medios para obtener financiamiento en la banca privada.

(2) También significará aquellas enfermedades que no sean terminales, según definidas en este capítulo, pero que hayan ocasionado un impedimento de carácter permanente que podría ser seriamente agravado de no intervenir la ciencia médica mediante un tratamiento que haya evidenciado que remedia o impide que se agrave dicha condición. No obstante, en este caso, la Junta podrá autorizar ayuda mediante donativo, préstamo o una combinación de ambos para este paciente, siguiendo los requisitos que este capítulo le impone y sean aplicables a estos casos.

La Junta, sin embargo, no podrá autorizar la ayuda en este tipo de casos mientras esté pendiente la ayuda a personas cuyo

préstamo, donativo, o una combinación de ambos, luego que la Junta Evaluadora creada al amparo de dicha ley, considere la solicitud y entienda que el solicitante cumple con los requisitos médicos y económicos para aprobarla. Art 11, 24 L.P.R.A. sec. 3229.

III

Según surge de la evidencia que obra en el expediente, entre el Fondo y la señora Ortiz Alvarado hubo un acuerdo mediante el cual el esposo de ésta recibiría una ayuda en calidad de donativo para el trasplante de hígado que urgía, siempre y cuando cumpliera con unos requisitos de elegibilidad. Sin embargo, ha pesado en nuestro ánimo el silencio que mantuvo la señora Ortiz Alvarado cuando se le cuestionó si poseía algún seguro. Como señalamos en BPPR v. Sucn. Talavera, 174 D.P.R. 686, 689 (2008), la buena fe es "generadora de deberes y... marco ético-moral del comportamiento debido en todas las etapas de la relación contractual".

Aunque de las minutas que obran en el expediente surge que el matrimonio Alvarado-Ortiz se comprometió a devolver cualquier cantidad de dinero conforme al compromiso firmado cuando tramitaron la ayuda con el Fondo, lo cierto es que en ese documento se dispone

---

padecimiento se define según lo dispuesto en la cláusula (1) de este inciso. La Junta adoptará la reglamentación para atender estos casos.

únicamente la devolución de **sobrantes de donativos**. En el lenguaje de dicho compromiso no se hace referencia a cualquier cantidad de dinero, aunque no provenga de donativos.[3] De haber sido así, otro sería el escenario de la controversia que nos ocupa.

Así pues, luego de un minucioso análisis de la Ley Núm. 150, supra, así como del "Reglamento para el Funcionamiento y la Administración del Fondo para Servicios contra Enfermedades Catastróficas y su Junta Evaluadora", derogado hoy pero vigente al momento de suscitarse la controversia, observamos que ninguno prevé solución para una situación como la que nos ocupa. Por ello, en ausencia de disposición legal que nos permita dilucidar esta controversia, hacemos uso del principio general de hermenéutica que dispone que "[e]n las materias que se rijan por leyes especiales, la deficiencia de éstas se suplirá por las disposiciones de este título". Art. 12 del Código Civil, 31 L.P.R.A. sec. 12.

En atención a ese principio y a la responsabilidad insoslayable que tenemos de atender las controversias que se nos presentan, acudimos al Código Civil para resolver este caso.

---

(3) Esta definición no incluye enfermedades epidémicas".

[3] El compromiso del solicitante lo que dice es:

"Acepto ceder y traspasar al Fondo todos los **sobrantes de donativos** que reciba, sean voluntarios o solicitados por la condición de enfermedad catastrófica, recibido con

IV

Por definición, un contrato es un acuerdo de voluntades por medio del cual los interesados se obligan. L. Diez Picazo, Fundamentos del Derecho Civil Patrimonial, 2da ed., Madrid, Tecnos, 1983, Vol. 1, pág. 96. El consentimiento de las partes en la celebración de un contrato, es elemento esencial para su existencia. J. M. Lete del Río & J. Lete Achirica, Derecho de Obligaciones, 1ra ed., Navarra, Ed. Aranzadi S.A., 2005, Vol. 1, págs. 430-431. Éste "debe haberse formado... libre, consciente y deliberadamente; en caso contrario, se dice que está viciado, lo que da lugar a la anulabilidad del negocio". Íd., págs. 430-431.

Como sabemos, el error, la violencia, la intimidación y el dolo son los factores que vician el consentimiento. Art. 1217 del Código Civil, 31 L.P.R.A. sec. 3404. De probarse que uno de estos elementos concurrió en la contratación, "la parte afectada cuenta con una acción para solicitar la nulidad [anulabilidad] del contrato, la cual puede ser ejercitada dentro de un periodo de cuatro años, contados a partir de la consumación del contrato o desde que ha cesado la violencia o intimidación contra dicha parte". Pérez Rosa v. Morales Rosado, 172 D.P.R. 216, 229 (2007). Su efecto es que "las partes están generalmente obligadas a restituirse las prestaciones objeto del contrato". Íd.

anterioridad, durante o con posterioridad al tratamiento recibido".

Véase, además, Art. 1255 del Código Civil, 31 L.P.R.A. sec. 3514.

El dolo, como vicio del consentimiento, consiste en la utilización de "palabras o maquinaciones insidiosas de parte de uno de los contratantes, [para inducir al] otro a celebrar un contrato que, sin ellas, no hubiera hecho". Art. 1221 del Código Civil, 31 L.P.R.A. sec. 3408. Se trata de "todo un complejo de malas artes, contrario a las leyes de la honestidad e idóneo para sorprender la buena fe ajena, generalmente en propio beneficio". L. Díez Picazo, Fundamentos del Derecho Civil Patrimonial, 6ta ed., Navarra, Ed. Aranzadi SA, 2007, Vol. I, pág. 212. Cabe señalar que el dolo tiene dos acepciones reguladas en nuestro Código Civil. Márquez v. Torres Campos, 111 D.P.R. 854, 863 (1982). "[P]uede manifestarse al momento de la contratación o posteriormente, en la consumación del contrato". Pérez Rosa v. Morales Rosado, supra, pág. 229. La primera de estas acepciones "causa la anulabilidad del contrato por vicio en el consentimiento, en el origen del contrato, cuando éste se obtiene a través de maquinaciones insidiosas". Íd., pág. 863. Su segunda acepción "consiste en el dolo contractual que ocurre en el curso de la consumación del contrato o sea en el cumplimiento de las obligaciones contractuales, regida por los Arts. 1054 y 1055 (31 L.P.R.A. secs. 3018 y 3019).". Íd.

Ahora bien, el dolo no produce la nulidad del contrato en todas las circunstancias. "Sólo es dolo,

propiamente hablando, el *dolus malus*". M. Albaladejo García, <u>Derecho Civil I: Introducción y Parte General</u>, 17ma ed., Madrid, Ed. Edifoser S.L., 2006, Tomo I, pág. 606. Sin embargo, dentro del *dolus malus*, hay que distinguir el causante y el incidental. <u>Íd.</u>, pág. 607. Por tanto "[e]l Código exige, en efecto para que el dolo sea causa de la impugnación contractual, que las maquinaciones provengan de uno de los contratantes, que sean empleadas de una manera maliciosa para provocar el engaño de la otra parte y que la determinen efectivamente a la contratación". J.L. Lacruz Verdejo, <u>Elementos de Derecho Civil</u>, 4ta ed., Madrid, Dykinson, 2007, Vol. 1, pág. 366. Aunque la doctrina apunta a que el dolo no se presume, lo cierto es que "como cualquier otro elemento mental, no tiene que ser establecido directamente, sino que puede inferirse de las circunstancias presentes en el caso en particular". <u>Pérez Rosa v. Morales Rosado</u>, <u>supra</u>, pág. 229.

"Es causante el dolo cuando determina la emisión de la declaración, que sin él no se hubiese realizado…; es incidental, cuando también sin él se hubiese emitido, pero en condiciones diversas y generalmente más favorables para el que lo sufre". M. Albaladejo García, <u>op cit.</u>, pág. 607. El dolo incidental sólo da lugar a la indemnización de los daños y perjuicios ocasionados. Art. 1222 del Código Civil, 31 L.P.R.A. sec. 3409. No produce la nulidad del contrato, ya que "no tiene una influencia decisiva en la esencia de la obligación, sino que sólo

facilita la celebración del contrato". Pérez Rosa v. Morales Rosado, supra, pág. 230 n. 7. Véanse, además, Colón v. Promo Motor Imports, Inc., 144 D.P.R. 659, 667 (1997); J.R. Vélez Torres, Curso de Derecho Civil: Derecho de Contratos, San Juan, Rev. Jur. U.I.P.R., 1990, T. IV, Vol. II, págs. 58-61. Es decir, el dolo incidental no es causa de nulidad porque "el contrato de todas formas se hubiera celebrado, aunque no con las mismas condiciones". Íd.

Siempre que sea engañoso, el elemento objetivo del dolo puede consistir de cualquier conducta como "astucias, argucias, mentiras, sugestiones, [y] artificios; consisten en la invención de hechos falsos, en la ocultación de los existentes, o en suministrar referencias incompletas de éstos, etc.". M. Albaladejo García, op. cit., pág. 607. Por ello, la jurisprudencia española ha expresado que constituye dolo "cualquier clase de comportamiento, sea por comisión (positivo) o por omisión (negativo)". Íd., págs. 607-608.

Así, por ejemplo, en la sentencia española de 23 de noviembre de 1998 Núm. 1085/1998, se dispuso que el dolo no solo se da cuando existe una maquinación directa "sino también una reticencia del que calla o no advierte debidamente a la otra parte, sin que ello lo pueda invalidar la confianza, buena fe o ingenuidad de la parte afectada". Es la reticencia "una contradicción con el deber de información fidedigna por parte de los contratantes, en orden a la adecuada determinación de los

extremos básicos del contrato, se tiene específicamente en cuenta por el ordenamiento positivo, aunque no incluya necesariamente malicia, si la ocultación o la inexactitud tiene por sí misma una influencia fundamental en la conformación típica del contenido contractual". J. Lacruz Berdejo, op cit., pág. 367.

Asimismo, la sentencia de 31 de diciembre de 1998 Núm. 1239/1998 hace referencia a la sentencia de 26 de octubre de 1981(RJ 1981, 4001) y señala que

> **"el concepto de dolo que da el artículo 1269 del Código Civil, no sólo comprende la insidia directa e inductora sino también la reticencia dolosa del que calla o no advierte debidamente**-Sentencias de 6 junio 1953 (RJ 1953,1658),7 enero 1961, 20 enero 1964 (RJ 1964,355)-" **siendo esta segunda forma o modalidad del dolo a la que se refiere el citado inciso final del párrafo 3.º del artículo 10,** como resalta la Sentencia de 12 julio 1993 (RJ 1993,6006) al decir que "el dolo que se aprecia es, evidentemente de naturaleza negativa, en cuanto supone reticencia en la obligada que silenció los hechos y circunstancias influyentes y determinantes de la conclusión del contrato, que de haberlos sabido la otra parte influirían decididamente en su voluntad de celebrar el contrato y que encuentra encaje en el artículo 1269 del Código civil (Sentencia 26 octubre 1981)". (Énfasis en el original.)

Véase, además, Sentencia de 15 de junio de 1995, RJ 1995, 5296.

Sin embargo, aunque el silencio puede constituir dolo, para que se considere como tal, es necesario que "exista por la razón que sea, un deber de informar (así conforme la buena fe o a las opiniones del tráfico)". M. Albaladejo García, op. cit., pág. 608. Como vemos entonces, para que se configure el dolo no es siempre

necesaria una acción afirmativa. "[C]allar sobre una circunstancia importante" constituye dolo. García Reyes v. Cruz Auto Corp., 173 D.P.R 870, 886 (2008). Véanse, Bosques Soto v. Echevarría, 162 D.P. R. 830, 836 (2004); Márquez v. Torres Campos, supra, pág. 865. Cónsono con lo anterior, el comportamiento doloso puede configurarse en

> callar consciente o en cualquier otra conducta concluyente cuando preexista un deber u obligación a verificar una comunicación o declaración veraz o cuando haya de producirse esa declaración según la buena fe o las concepciones dominantes en el tráfico; **además, no es necesario que el error del que es víctima de dolo sea disculpable.** (Énfasis suplido.)

> I. Moratilla Galán, <u>Los actos de voluntades para que sean conocidos, tienen que expresarse mediante la necesaria declaración de voluntad que debe emitir cada contratante para formar la voluntad concorde que exige la existencia del contrato</u>, Revista Crítica de Derecho Inmobiliario, Análisis Crítico de Jurisprudencia, Núm. 704, pág. 2747.

Al contratar, las partes tienen que cumplir con ciertos deberes especiales de conducta. La buena fe es uno de ellos. A esos efectos señalamos en Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 528 (1982), que "[l]a buena fe impone a las partes un deber de lealtad recíproca en las negociaciones". Por consiguiente, la buena fe es norte en todo negocio jurídico. Por ello, no es necesaria disposición alguna que exija a las partes actuar conforme a ese principio pues las partes tienen el deber recíproco de así hacerlo. González v. The Commonwealth Ins. Co., 140 D.P.R. 673, 683 (1996).

Como citamos con aprobación recientemente en VDE Corporation v. F & R Contractors Inc., Op. de 15 de

octubre de 2010, 2010 T.S.P.R. 210; 2010 J.T.S. 231; 180

D.P.R. ___ (2010), Díez Picazo nos dice que la buena fe

es

> la lealtad en el tratar, el proceder honrado y
> leal. Supone el *guardar la fidelidad a la*
> *palabra dada y no defraudar la confianza, ni*
> *abusar de ella*; supone un conducirse como cabe
> esperar de cuantos, con pensamiento honrado,
> intervienen en el tráfico como contratantes. Lo
> que se aspira a conseguir, se ha dicho, es que
> el desenvolvimiento de las relaciones
> jurídicas, el ejercicio de los derechos y el
> cumplimiento de las obligaciones, se produzca
> conforme a una serie de principios que la
> conciencia jurídica considera necesarios,
> aunque no hayan sido formulados. (Énfasis en el
> original.)

> L. Díez-Picazo, La doctrina de los propios
> actos, Barcelona, Eds. Aries, 1963, pág. 157.

> Véanse, además, Colón v. Glamourous Nails, 167

D.P.R. 33, 45 (2006); B.W.A.C. Int'l v. Quasar Co., 138

D.P.R. 60, 73, esc. 9 (1995); Arthur Young & Co. v. Vega

III, 136 D.P.R. 157, 170, esc. 11 (1994); Int. General

Electric v. Concrete Builders, 104 D.P.R. 871, 876, esc.

4 (1976).

El vicio del consentimiento por dolo, a diferencia

de cuando es por error, no requiere que el error del que

se es víctima sea disculpable. I. Moratilla Galán, op

cit. Precisamente esta es una de las características que

distinguen estas dos figuras. Por ello, "quien invoca el

error, no debe haber incidido en él por su propia culpa.

**En el dolo, por el contrario, no hace falta que concurran**

**tales requisitos; basta que se haya producido una**

**captación intencionada de la voluntad del contratante".**

(Énfasis nuestro.) M. Albaladejo, Comentarios al Código

Civil y Compilaciones Forales, Ed. EDERSA, 1993, T. XVII, Vol. I-B, pág. 390.

Algunos tratadistas opinan que aunque el ordenamiento jurídico no exige para que haya dolo "ninguna cualificación del error aparte de haber sido determinante de la contratación" debería requerirse la excusabilidad que se demanda en los casos que se invalida el consentimiento por error. J. Puig Brutau, Fundamentos de Derecho Civil, 3ra ed., Barcelona, Ed. Bosch, 1985, T. II, Vol. I, pág. 95, haciendo referencia a Luna Serrano, Elementos de Derecho Civil, II, Barcelona, 1997, pág. 65. Sin embargo, esa no es la postura que hemos adoptado. Desde Márquez v. Torres Campos, supra, pág. 865, señalamos que el dolo se "caracteriza como la infracción voluntaria y consciente de un deber jurídico que ocasiona al otro contratante un perjuicio del que debe responder". Véase, además, Manresa, Comentarios al Código Civil Español, 6ta ed., Madrid, ed. Reus, 1967, T.8, Vol. 1, pág. 212.

Vemos, pues, que en Márquez v. Torres Campos, supra, no exigimos al demandante un deber de diligencia antes de contratar con el demandado. De los hechos de ese caso surge que "[e]l mediador Domínguez y el prospecto comprador… visitaron la finca 'Martín González'. Puesto que llovía fuertemente al llegar a la finca, no pudieron desmontarse, pero desde la guagua del demandante, pudieron observar como 30 cabezas de ganado pasearse de un lado a otro". Íd. pág. 857. Luego de dicha visita se

otorgó el contrato. Bien pudimos frenar su causa de acción por dolo ante la ausencia de un cotejo por un veterinario certificado, previo a la contratación. Sin embargo, no lo hicimos. Ello obedeció a que el deber de lealtad que impone "[e]l principio de la buena fe, *no depende de lo que una parte pudo haber averiguado, mediando una razonable diligencia, sino que corresponde a lo que las partes debieron revelarse mutuamente durante el proceso de negociación*. Este es el *deber especial de lealtad* que exige dicho principio". (Énfasis en el original.) Ortiz Brunet v. El Mundo, 169 D.P.R. 332, 343 (2006) (Opinión de conformidad emitida por el Juez asociado señor Rebollo López). Todo este razonamiento está fundado en que la "buena fe significa fundamentalmente rectitud y honradez en los tratos y supone un criterio o una manera de proceder a la cual las partes deben atenerse en el desenvolvimiento de las relaciones jurídicas y en la celebración, interpretación y ejecución de los contratos". L. Díez Picazo, op cit., pág. 61.

V

A raíz de la condición en el hígado que aquejaba al Sr. Alvarado Vázquez, la Sra. Ortiz Alvarado acudió al Fondo en busca de ayuda. Sin embargo, ésta nunca advirtió a esta entidad de la existencia del seguro a su favor por el cual pagaba una prima mensual. Ante tal omisión, el Fondo procedió a aprobar la ayuda para el trasplante como un donativo.

Como señaló el foro apelativo intermedio y Great American repite en su alegato, aquí no ocurrió un cambio de la naturaleza de la ayuda suministrada de un donativo a un préstamo. Cuando el Fondo aprobó la ayuda para el trasplante del señor Alvarado Vázquez, sin duda lo hizo como un donativo, a base del estudio de la solicitud que cumplimentó la señora Ortiz Alvarado, en la que no mencionó la existencia de póliza alguna. De haberla mencionado, de seguro el Fondo no habría aprobado la ayuda como un donativo, sino como un préstamo o una combinación de ambos, o simplemente la habría denegado.

Cabe añadir que en ningún lugar de la ley que crea el Fondo se menciona que, si luego de procesada una solicitud se descubre la existencia de algún seguro, la naturaleza de la ayuda suministrada se transformará en un préstamo. La ley es clara y no dispone nada sobre ese particular. Si el Fondo deseara que ante una situación como esa ocurra una transformación automática de la naturaleza de la ayuda suministrada originalmente, le toca a la Rama Legislativa actuar al respecto. Los tribunales no tenemos la potestad de legislar. Pueblo v. Agostini Rodríguez, 151 D.P.R. 426, 435 (2000).

Inadvertido del seguro que favorecía al señor Alvarado Vázquez, el Fondo entendió que este era candidato para beneficiarse de la ayuda como un donativo. Ahora bien, un cuidadoso análisis del proceder de la señora Ortiz Alvarado nos hace inferir que ésta vició el consentimiento que el Fondo prestó para ese donativo. Sin

lugar a dudas, la señora Ortiz Alvarado actuó dolosamente al omitirle información crucial al Fondo que influenciaría su decisión en aprobar o no la ayuda. Se mantuvo silente en el momento en que el Fondo le cuestionó si tenía o no una póliza de seguro que cubriera el trasplante en cuestión. Por ello, no importan las diligencias que pudo haber hecho el Fondo para averiguar lo que se le ocultaba; el silencio observado por la señora Ortiz Alvarado violó los deberes especiales de lealtad que impone la figura de la buena fe contractual.

La conducta de la señora Ortiz Alvarado demostró la intención de omitir información trascendental que fue la que motivó a que el Fondo aprobara la ayuda como un donativo. Por eso, su omisión constituyó un elemento esencial en la contratación, que de haberse revelado habría cambiado el proceder de una de las partes. Esta conducta violó los principios básicos de lealtad, honradez y confianza que debe caracterizar a todo contratante. Entendemos que con su proceder abusó de la bondad del Estado y del propósito loable del Fondo de Enfermedades Catastróficas Remediables.

VI

La aseguradora aduce que no le corresponde pagar por el costo del trasplante de hígado realizado al señor Alvarado Vázquez "por no haber **incurrido** éstos en gasto alguno corroborable mediante factura o recibo de pago". Alegato de la parte recurrida, pág. 3. Great American solo reembolsó los gastos relacionados que el matrimonio

Alvarado-Ortiz evidenció mediante facturas o recibos, tales como pasajes de avión ($1,410.21), hospedaje ($1,345), cuidado intensivo ($3,000) y el costo de una enfermera privada ($1,120). Es decir, Great American asegura que, según el contrato de seguro expedido a favor de los asegurados, para que proceda el reembolso por el costo del trasplante, era necesario que fueran los asegurados quienes hubieran pagado por la intervención y no el Fondo. Dicho lo anterior, analicemos entonces los principios que rigen el contrato de seguro en nuestra jurisdicción.

A

"El negocio de seguro es un puntal indispensable de la economía moderna". R. Cruz, op cit., pág. 30. Por eso, en reiteradas ocasiones hemos reconocido el alto interés público del que está revestida esta industria. S.L.G. Francis-Acevedo v. SIMED, 176 D.P.R. 372 (2009); Jiménez López v. SIMED, Op. de 6 de octubre de 2010, 2010 T.S.P.R. 208, 2010 J.T.S. 217; 180 D.P.R. __ (2010),; Véase, además, R. Cruz, op cit., pág. 1. Ello se debe "a su complejidad y efecto en la economía y la sociedad". Jiménez López v. SIMED, supra. "[L]os contratos de seguros han sido consistentemente objeto de interpretaciones judiciales por causa de la divergencia de criterios entre las partes en torno a los derechos y obligaciones que éstos puedan alegar". R. Cruz, op cit., pág. 30.

La Ley Núm. 77 de 19 de junio de 1957, según enmendada, mejor conocida como el Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 101, *et seq.*, es el cuerpo legislativo que se encarga de regular la industria de seguros en Puerto Rico. Por definición, el contrato de seguro es aquel "mediante el cual una persona se obliga a indemnizar a otra o a pagarle o proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo". Art. 1.020 del Código de Seguros, 26 L.P.R.A. sec. 102. Respecto a su naturaleza, los contratos de seguros son contratos típicos de adhesión. Jiménez López v. SIMED, supra. Son "redactado[s] íntegramente por el asegurador en todo su contenido; esto es, el convenio de seguro, las exclusiones, y las condiciones, sin que el asegurado haya tenido la oportunidad de negociar el contenido con el asegurador". R. Cruz, op cit., pág. 12. Por eso "hemos reconocido, como al igual lo han hecho otros tribunales estatales de los Estados Unidos, que los contratos de seguros que contengan cláusulas obscuras, o que en su contenido exista algún tipo de ambigüedad,... serán interpretados liberalmente en favor del asegurado y restrictivamente en contra del asegurador redactor del contrato". R. Cruz, op cit., pág. 2.

Al disponer que en la interpretación de las pólizas prevalecerá el texto que más beneficie al asegurado, el gobierno ha dejado entrever su intención de proteger al máximo al asegurado. La naturaleza de los contratos de

seguros justifica el interés que tiene el Estado de salvaguardar a sus ciudadanos contra la posible ambigüedad que pudiera resultar de su interpretación. Íd., pág. 37. Con ello, no pretendemos "desvirtuar o cuestionar la validez de los contratos de adhesión[;] sólo hacemos referencia a la intervención gubernamental mediante estatutos y reglamentos, a los fines de evitar que el asegurado quede a merced del asegurado por ejercer éste prácticamente un monopolio en la redacción del contrato". Íd.

Es harto conocido que el contrato es ley entre las partes. El contrato de seguro no es la excepción. La póliza es "el contrato por escrito mediante el cual una parte, el asegurador, se compromete, a cambio del pago de una prima, a indemnizar a un tercero, por lo general al asegurado o un reclamante, por una pérdida contingente al ocurrir un evento futuro incierto previsto. Cualquier plan, certificado, contrato, acuerdo, endoso, aditamento o cualquier otro documento que evidencia cubierta de seguros se entenderá como incluido en la póliza". Íd., pág. 386.

Así como el Art. 15 del Código Civil, 31 L.P.R.A. sec. 15, ordena que interpretemos las palabras de una ley "en su más corriente y usual significación, sin atender demasiado al rigor de las reglas gramaticales, sino al uso general y popular de las voces", también debemos interpretar el lenguaje de una póliza. Jiménez López v. SIMED, supra. Véase Marín v. American Int´l. Ins. Co. of

P.R., 137 D.P.R. 356, 361 (1994). Al interpretar las cláusulas del contrato a la luz del sentido popular de sus palabras se garantiza que la persona que adquiere una póliza pueda confiar en la cubierta que se le ofrece. Pagán Caraballo v. Silva, Ortiz, 122 D.P.R. 105, 110 (1988). También "se buscará el sentido o significado que a las palabras de la póliza le daría una persona normal de inteligencia promedio que fuese a comprar la póliza". Íd. De igual forma, por mandato de ley, "[t]odo contrato de seguro deberá interpretarse globalmente, a base del conjunto total de sus términos y condiciones, según se expresen en la póliza y según se hayan ampliado, extendido, o modificado por aditamento, endoso o solicitud adherido a la póliza y que forme parte de ésta". Art. 11.250 del Código de Seguros, 26 L.P.R.A. sec. 1125. Véase, además, Coop. Ahorro y Créd. Oriental v. S.L.G., 158 D.P.R. 714, 723 (2003). Por consiguiente, "cuando los términos, condiciones y exclusiones de un contrato de seguros son claros, específicos y no dan margen a ambigüedades o diferentes interpretaciones, deben hacerse valer de conformidad con la voluntad de las partes". Martínez Pérez v. U.C.B., 143 D.P.R. 554, 563 (1997); López v. Manzano Pozas, 141 D.P.R. 139, 156 (1996). Por ello, "en ausencia de ambigüedad las cláusulas del contrato son obligatorias". Íd.

Como último señalamiento, cabe apuntar que estos contratos se rigen por sus propios términos y condiciones. Ahora bien, cuando de interpretación se

trata, el Código de Seguros ordena que se haga con la ayuda de "la ley, las reglas y reglamentos razonablemente dictados por el Comisionado de Seguros". Íd. Es este último el ente especializado en esta materia y quien procura el cumplimento con las disposiciones de la ley. Jiménez López v. SIMED, supra. Además, es por excelencia, el encargado de la fiscalización y la reglamentación de esta industria. Íd. Es decir, el Código de Seguros será la fuente de interpretación por excelencia. Si este último "no dispone expresamente en cuanto a la regla de interpretación aplicable y existe ambigüedad respecto a alguna disposición de [la] póliza se tendrá en primera instancia que recurrir al Código Civil o en su defecto a la jurisprudencia interpretativa al respecto". R. Cruz, op cit., pág. 34.

B

Como señalamos, Great American aduce que el lenguaje del "Suplemento Beneficio por Tratamiento y Servicios Médicos Hospitalarios Incurridos durante Trasplante de Órganos" dispone que se pagarán beneficios únicamente por **gastos incurridos**. Por ello afirma que el pago por dichos servicios no procede en esta ocasión.

Las cláusulas que disponen que únicamente se pagará por los gastos incurridos se remontan a finales de la segunda guerra mundial. 31, Appleman on Insurance 2d, Sec. 186.03[E][4], pág. 128 (1996). Durante aquella época, las compañías aseguradoras empezaron a incluir con regularidad en el lenguaje de los contratos de seguros

médicos cláusulas en cuanto a la forma de pago por tratamientos. Algunas pólizas eximían a la aseguradora de los cargos que al asegurado no se le requería pagar o por los que legalmente no hayan incurrido. Íd. Estas cláusulas respondieron a la realidad de esos tiempos. Muchos veteranos, que a su vez contaban con pólizas de seguro médico privadas, recurrían a las compañías aseguradoras a solicitar reembolso por los tratamientos recibidos en hospitales o instalaciones para veteranos. Íd. Ello ocasionaba que las compañías aseguradoras tuvieran que responder por gastos médicos indeterminados aunque no había forma de establecer con precisión sus costos reales. Íd.

A raíz de lo anterior, en 1954 se resolvió en Maryland el caso Plank v. Summers, 203 MD. 552, 102 A2d 263, 266 (1954). Íd., pág. 129. En éste se decidió que un soldado podía presentar -como parte de sus daños en una acción de daños y perjuicios- evidencia de servicios hospitalarios financiados gratuitamente por el gobierno. Todo esto surgió al amparo de la regla de la fuente colateral, adoptada por el *Restatement of the Law* y por varios estados.

"Dispone esta regla que el demandante tiene derecho a todos los gastos específicos que correspondan aunque (1) los servicios le hayan sido rendidos gratuitamente, o (2) los gastos le hayan sido pagados por otro, o (3) como una liberalidad, su patrono u otra persona le haya pagado sus salarios, o (4) estos gastos estén cubiertos por

pólizas de seguros, siempre que no se trate de seguros de cosas". C. Irizarry Yunqué, Responsabilidad Civil Extracontractual, 7ma ed., San Juan, Panamericana Formas e Impresos S.A., 2009, pág. 334.

Esta regla fue adoptada en Puerto Rico en el caso Goose v. Hilton Hotels Int'l, Inc., 79 D.P.R. 523 (1956). Se apoya en que "el demandado no debe beneficiarse de la liberalidad de otros para con el demandante o de las primas que éste ha pagado". Íd., págs. 334-335.

Así las cosas:

> Using the collateral source rule, insurers sought to apply the exclusion for charges the insured was not "required to pay" to any other situations in which a court might be persuaded to relieve them of their contractual obligations, such as: payment of charges by a compensation insurer, or by a carrier of uninsured motorists or no-fault protection; payment by another medical benefits carrier; payment by a parent, child, spouse, or other relative, or by the tortfeasor; payment under Blue Cross or Medicare; or hospitalization in a charitable or tax-supported establishment.

Appleman on Insurance 2d, supra, pág. 129.

Sin embargo, esta norma no fue adoptada por la gran mayoría de los estados de la Unión. Su razonamiento fue el siguiente:

> [A]n insurer, which has committed itself to the payment of hospital charges, **is not relieved of that obligation by reason of the fact that benefits might be due from another source,... either in whole or in part.** This is true also when some person other than the insured pays the expenses or the services are provided in an institution where no charge would be made to the insured in the absence of the insurance. "Courts have construed the term "incurred" to mean "incurred by or on behalf of the insured," defining the term "required to pay" as meaning required under the law in the absence of

payment being made from the collateral source."(Énfasis nuestro y escolios omitidos.)

Appleman on Insurance 2d, id., págs. 129-130.

Véanse, además, Nahom v. Blue Cross & Blue Shield, 180 Ariz. 548, 885 P.2d 113,119 (1994); Hollister v. Gov't Employees Ins. Co., 192 Neb. 687, 224 N.W. 2d 164 (1974); Denton v. Int'l Heath & Life Ins. Co., 270 Or. 444, 528 P.2d 546 (1974); Dunbar v. Nat'l Sec. Life & Accident Ins. Co., 439 S.W. 2d 892 (Tex. Civ. App. 1969).[4]

Con el beneficio del derecho reseñado, pasemos a evaluar si procede que Great American cumpla con los términos de su póliza y pague por los gastos del trasplante de hígado del señor Alvarado Vázquez.

VII

Sin lugar a dudas, la cubierta que solicitaron los asegurados en 2002 cubría, entre otras cosas, el trasplante de órganos. Así lo asegura Great American en su alegato al señalar que, además de la póliza de seguro de enfermedades perniciosas y de cáncer, los peticionarios solicitaron "suplemento o endosos de cuidado intensivo, muerte y tratamiento médico de emergencias debido a accidentes y suplemento para

---

[4] Ahora bien, los Art. 16.170 y 16.180 del Código de Seguros de Puerto Rico, 26 L.P.R.A. secs. 1621 y 1622, disponen que las pólizas podrán incluir cláusulas para determinar la compensación en situaciones en las que el asegurador tiene seguro del mismo tipo con otras aseguradoras. Sin embargo, en el suplemento de cubierta para trasplante no se incluyó ninguna de esas cláusulas. De todos modos, de haberlas incluido, no aplicaban ya que el Fondo no es una compañía aseguradora.

trasplante de órganos". <u>Alegato de la parte recurrida</u>, pág. 2. Por dicha cubierta pagaban $49.62 mensuales. No obstante lo anterior, aunque Great American no niega que la póliza a favor de los asegurados cubría trasplante de órganos, aduce que no le corresponde pagar por su costo, pues de los recibos suministrados por los asegurados se desprende que quien incurrió en el pago fue el Fondo y no los asegurados.

El derecho reseñado nos da a entender que cuando en el lenguaje de las pólizas se incluyen cláusulas que indican que únicamente se pagarán por gastos incurridos eso no significa que la aseguradora queda eximida de cumplir con su responsabilidad conforme a la póliza si otra persona, entidad o seguro paga por el asegurado. La gran mayoría de los estados de la Unión han resuelto que una aseguradora, que se ha comprometido al pago de los cargos por servicios hospitalarios, no será relevada de su obligación por el hecho de que los beneficios pudieran haber sido satisfechos por otra fuente, aun cuando ello pueda significar que los gastos fueron satisfechos en parte o en su totalidad por esa otra fuente. *Appleman on Insurance 2d*, <u>supra</u>, pág. 129. No podemos olvidar que la ayuda recibida del Fondo se trató de un beneficio colateral que forma parte de la política social del Gobierno de Puerto Rico.

Por ello, en la situación particular que nos ocupa, la interpretación que hace Great American del suplemento de beneficios por trasplante de órganos añade una

restricción que no aparece en la póliza. Lo que ese suplemento dispone es que "se pagarán por gastos incurridos por cuidado médico y tratamiento del asegurado, y de miembros de su familia si se ha solicitado cubierta familiar, por servicios y materiales suministrados relacionados con un trasplante cubiertos por esta Póliza". De esa oración no se puede concluir lo que hoy la aseguradora pretende sostener, a saber, que solo se reembolsarán los gastos que pagó el asegurado y no los que incurrió pero pagó un tercero. No podemos olvidar que el lenguaje de las pólizas deberá interpretarse "en su más corriente y usual significación, sin atender demasiado al rigor de las reglas gramaticales, sino al uso general y popular de las voces". Art. 15 del Código Civil, supra. Véase, además, Jiménez López v. SIMED, supra. Cualquier persona de inteligencia común que lea la póliza no pensaría que se excluye el reembolso por trasplante de órganos de la persona asegurada si no fue ésta quien los pagó inicialmente sino otra persona o entidad.

Por tanto, Great American no puede ahora eludir su responsabilidad de cubrir unos gastos para los cuales le cobra una prima a la demandante fundamentándose en que ella no incurrió directamente en ellos.

Por otra parte, apoyar la postura de los recurridos nos llevaría al absurdo de concluir que si una persona que se encuentra en un estado crítico de salud permite que un tercero le ayude a sufragar de forma temporera y

de emergencia una situación de salud, estaría renunciando a cualquier reclamo que pudiera hacerle a su aseguradora. Avalar esa consecuencia socavaría valores esenciales de nuestra sociedad como lo son la empatía, la convivencia social y la solidaridad. Evidentemente, concebir ese supuesto dista de los mejores intereses de nuestro pueblo como sociedad civilizada.

Por ello, concluimos que procede que Great American pague a los asegurados la cantidad de $150,000 para trasplante de órganos establecida en la póliza.

## VIII

Ahora nos resta determinar el vehículo procesal que tiene el Fondo para recuperar del matrimonio Alvarado-Ortiz los $150,000 que desembolsó pero que hasta ahora solo ha reclamado a Great American.

Según se desprende del expediente, el Fondo intervino en este litigio luego de que en el descubrimiento de prueba inicial saliera a relucir que incurrió en los gastos del trasplante de hígado del señor Alvarado Vázquez. Por ello, el Tribunal de Primera Instancia concedió término para que el Fondo interviniera en el pleito y así lo hizo.

Hemos dicho que la intervención

> [e]s una institución procesal mediante la cual un tercero comparece voluntariamente o por necesidad solicitando ser incluido en una acción pendiente ante los tribunales… Esta regla no crea derechos sustantivos o causa de acción alguna. Es simplemente una disposición mediante la cual una persona que no es parte en el pleito comparece, voluntariamente o por necesidad, a presentar una reclamación o una

> defensa, en una acción pendiente, y convertirse de ese modo en parte para fines de la reclamación o defensa presentada.
>
> J. Cuevas Segarra, Tratado de Derecho Procesal Civil, Tomo I, Publicaciones J.T.S., San Juan, P.R., 2000, págs. 427.

La intervención puede ser como cuestión de derecho o permisible. La primera de estas formas de intervención, regulada en la Regla 21.1 de Procedimiento Civil de 1979,[5] vigente al momento de los hechos, opera cuando la parte que solicite su intervención en el pleito reclame algún derecho o interés en la propiedad o asunto objeto del litigio y [demuestre] que tal derecho o interés puede, de hecho, quedar afectado por la disposición final del pleito. Chase Manhattan Bank v. Nesglo Inc., 111 D.P.R. 767, 770 (1981).

Por otra parte, la intervención permisible, regulada en la Regla 21.2 de Procedimiento Civil de 1979, opera cuando la ley confiera un derecho condicional a intervenir o cuando la reclamación o defensa del solicitante y el pleito principal tuvieren en común una cuestión de hecho o de derecho.[6]

---

[5] **"Regla 21.1 Como cuestión de derecho.**

Mediante oportuna solicitud, cualquier persona tendrá derecho a intervenir en un pleito (a) cuando por ley o por estas reglas se le confiere un derecho incondicional a intervenir; o (b) cuando el solicitante reclama algún derecho o interés en la propiedad o asunto objeto del litigio que pudiere de hecho quedar afectado con la disposición final del pleito."

[6] **"Regla 21.2. Intervención permisible.**

Mediante oportuna solicitud podrá permitirse a cualquier

Como hemos señalado, el criterio a utilizarse para determinar si se permite o no la intervención de una parte depende del "interés en la economía procesal representada por la solución en un solo pleito de varias cuestiones relacionadas entre sí y el interés en evitar que los pleitos se compliquen y eternicen innecesariamente". Chase Manhattan Bank v. Nesglo Inc., supra, pág. 770. Es decir, se trata de un concepto práctico, más que conceptual. Ready Mix Concrete Inc. v. Ramírez de Arellano y Co., Inc., 110 D.P.R. 869, 873 (1981). Por ello, a la hora de evaluar una solicitud de intervención, debemos analizar primero si existe de hecho un interés que amerite protección y segundo, si ese interés quedaría afectado, como cuestión práctica, por la ausencia del interventor en el caso. Chase Manhattan Bank v. Nesglo Inc., supra, pág.770.

---

persona     intervenir     en     un     pleito:

(a) cuando por ley se le confiera un derecho condicional a intervenir; o
(b) cuando la reclamación o defensa del solicitante y el pleito principal tuvieren en común una cuestión de hecho o de derecho.
    Cuando una parte base su reclamación o defensa en cualquier ley u orden ejecutiva cuya ejecución está a cargo de un funcionario o agencia gubernamental o en un reglamento, orden, requerimiento o acuerdo promulgado, expedido o celebrado de acuerdo con dicha ley u orden ejecutiva, podrá permitírsele al funcionario o agencia intervenir en el pleito mediante solicitud oportuna. Al ejercer su discreción, el tribunal considerará si la intervención dilatará indebidamente o perjudicará la adjudicación de los derechos de las partes originales."

Corresponde a las mismas reglas en las nuevas Reglas de Procedimiento Civil de 2009, 32 L.P.R.A. Ap. V.

En este caso, la intervención del Fondo era necesaria, toda vez que ésta fue la entidad que pagó por el tratamiento médico del señor Ortiz Alvarado. Sus intereses están claramente en juego. No podemos olvidar que este fondo se creó con el propósito loable de ofrecer ayuda a personas que no cuentan con medios económicos para sufragar sus tratamientos médicos. Sin embargo, el capital del Fondo no es infinito. Por tanto, su ausencia en este procedimiento primeramente afectaría su capital y, peor aún, trastocaría el propósito principal de esta entidad, a saber, sufragar los costos por tratamiento médico de personas verdaderamente necesitadas.

Ahora bien, aunque el Fondo es parte interventora en este procedimiento, no ha demandado al matrimonio Alvarado-Ortiz para que declare nulo el donativo y le reembolse la cantidad que le desembolsó. Solo intervino para reclamarle a la aseguradora. Como dispuso acertadamente el Tribunal de Apelaciones, Great American únicamente puede ser compelida a cumplir con los términos de su póliza por su asegurada. Sin embargo, nada impide que el Fondo enmiende su demanda de intervención y le reclame directamente al matrimonio Alvarado-Ortiz. Como se sabe, "[l]os estatutos que conceden discreción a los tribunales para autorizar enmiendas, dejar sin efecto actuaciones anteriores, y otros actos similares para lograr justicia sustancial, son preceptos reparadores que deben interpretarse liberalmente". J. Cuevas Segarra, op cit., pág. 314. Aunque "la liberalidad de la regla 13.1

para conceder enmiendas no es infinita; está condicionada por un juicioso ejercicio de discreción que ha de ponderar por el momento en que se solicitan, su impacto en la pronta adjudicación de la cuestión litigiosa, la razón o ausencia de ella para la demora o inacción original del promovente de la enmienda, el perjuicio que la misma causaría a la otra parte y hasta la naturaleza y méritos intrínsecos de la defensa que tardíamente se plantea". Epifanio Vidal Inc. v. Suro, 103 D.P.R. 793, 796 (1976). Véase, además, J. Cuevas Segarra, op cit., pág. 314.

Por todo lo anterior, ordenamos que al devolverse el mandato al Tribunal de Primera Instancia, Great American consigne la cantidad correspondiente a la póliza de seguro por trasplante de órganos. Si el Fondo reclama al matrimonio Alvarado-Ortiz mediante demanda enmendada dentro de los noventa días después de la devolución del mandato, podrá solicitar que el dinero permanezca consignado en aseguramiento de la sentencia que pueda obtener en el futuro. De lo contrario, el tribunal podrá autorizar que el matrimonio Alvarado-Ortiz retire el dinero consignado. Esta es la solución más justa, en protección del interés público que hay detrás del Fondo de Enfermedades Catastróficas Remediables. Si el interés de los esposos Alvarado-Ortiz siempre ha sido reembolsar al Fondo, como alegan, no debe haber controversia acerca de la liquidación del dinero consignado.

IX

Por todo lo anterior, se confirma la sentencia del Tribunal de Apelaciones. Asimismo, ordenamos que al devolverse el mandato al Tribunal de Primera Instancia, Great American consigne allí los $150,000 que le corresponde pagar según la póliza expedida a favor del matrimonio Alvarado-Ortiz. Estos fondos se mantendrán consignados por noventa días, tras lo cual serán desembolsados al matrimonio demandante-recurrido, a menos que en ese período el Fondo de Enfermedades Catastróficas Remediables enmiende su demanda para reclamar reembolso.

En esa eventualidad, el Fondo podrá solicitar que el monto necesario para cubrir su reclamo se mantenga consignado en aseguramiento de sentencia.

Se dictará Sentencia de conformidad.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lillian Ortiz Alvarado, William Alvarado Vázquez y la Sociedad Legal de Gananciales compuesta entre ambos<br><br>Recurridos<br><br>v.<br><br>Great American Life Assurance Company of PR, et als<br><br>Recurridos<br><br>Estado Libre Asociado de Puerto Rico, Departamento de Salud y el Fondo de Enfermedades Catastróficas Remediables<br><br>Peticionario-Interventor | CC-2009-1086 |

SENTENCIA

En San Juan, Puerto Rico, a 3 de junio de 2011.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte integrante de la presente Sentencia, se confirma la sentencia del Tribunal de Apelaciones. Asimismo, ordenamos que al devolverse el mandato al Tribunal de Primera Instancia, Great American consigne allí los $150,000 que le corresponde pagar según la póliza expedida a favor del matrimonio Alvarado-Ortiz. Estos fondos se mantendrán consignados por noventa días, tras lo cual serán desembolsados al matrimonio demandante-recurrido, a menos que en ese período el Fondo de Enfermedades Catastróficas Remediables enmiende su demanda para reclamar reembolso.

En esa eventualidad, el Fondo podrá solicitar que el monto necesario para cubrir su reclamo se mantenga consignado en aseguramiento de sentencia.

Lo acordó y ordena el Tribunal, y lo certifica la Secretaria del Tribunal Supremo.

Aida I. Oquendo Graulau
Secretaria del Tribunal Supremo