El Juez Asociado Señor Estrella Martínez
emitió la opinión del Tribunal.
Nos corresponde examinar por primera ocasión la Ley de Derecho de Multipropiedad y Clubes Vacacionales de Puerto Rico, Ley Núm. 252-1995 (31 L.P.R.A. sec. 1251 et seq.) (Ley Núm. 252), según enmendada. Específicamente, debemos resolver si un consumidor de esta industria puede cancelar un contrato de compraventa de una multipropie-dad o club vacacional cuando sus instalaciones no se com-pletan dentro de la fecha estimada en el documento de *536 ofrecimiento al público (public offering statement) y no se provee una advertencia del derecho del desarrollador a fi-nalizarlas dentro de un término de dieciocho meses, reco-nocido expresamente en la ley especial.
I
El 3 de abril de 2005, el Sr. Wilfredo Silva Olivencia y su esposa la Sra. Yvette Alicea Ruiz (Silva-Alicea) adquirieron de Aquarius Vacation Club (Aquarius) una semana de uso anual, correspondiente a la segunda del mes de junio, por el término de sesenta años en el complejo vacacional Bo-querón Beach Resort. Para ello, pagaron $10,000, $55 de gastos administrativos y $170 por la cuota de manteni-miento del 2006. El contrato suscrito por las partes esta-bleció que el derecho de uso comenzaría en el 2006. Con-juntamente, en el documento de ofrecimiento público se informó a los esposos Silva-Alicea que la construcción de las instalaciones estaría completada para la primera mitad de ese año.
Posteriormente, los esposos Silva-Alicea hicieron las gestiones para el disfrute de la semana adquirida. Al ha-cerlo se les informó que no podían disfrutarla, ya que las instalaciones no estaban construidas. Como consecuencia, en agosto del 2006 presentaron una querella ante el Depar-tamento de Asuntos del Consumidor (D.A.Co.). Alegaron que Aquarius incumplió el contrato porque en el 2006 no pudieron disfrutar su derecho vacacional, puesto que las instalaciones todavía se encontraban en construcción. Ello a pesar de que el contrato establecía que su derecho co-menzaría ese año. A base de esas alegaciones, solicitaron la cancelación del contrato y la devolución de lo pagado. Los esposos no solicitaron ni presentaron prueba de daños, ya que sometieron su caso mediante memorando de derecho.
Instado el procedimiento ante D.A.Co., Aquarius argüyó que no incumplió con el contrato. Indicó que la Ley Núm. *537 252, supra, le permite completar las instalaciones dentro de un periodo de dieciocho meses siguientes a la fecha es-timada por el desarrollador. Sostuvo que actuó conforme al estatuto, ya que solicitó a tiempo un término adicional para finalizar el desarrollo y le fue conferido.
Al no haber controversias sobre los hechos, las partes sometieron la polémica a través de memorandos de derecho. Luego de evaluarlos, D.A.Co. emitió una determi-nación el 27 de agosto de 2008 en la cual decretó la resolu-ción del contrato y la devolución de los $10,225 pagados por Silva-Alicea. La agencia interpretó que Aquarius in-cumplió con su obligación. Articuló que Aquarius acordó con el matrimonio Silva-Alicea la disponibilidad de las ins-talaciones para la segunda semana de junio de 2006, lo que no ocurrió. Entendió que las manifestaciones de Aquarius se podrían considerar como una práctica engañosa.
A tiempo, Aquarius presentó una solicitud de reconsideración. En ésta impugnó la resolución del con-trato y el rembolso ordenado. D.A.Co. nada dispuso en cuanto a la reconsideración presentada, por lo que Aquarius acudió oportunamente ante el Tribunal de Apelaciones mediante un recurso de revisión administrativa.
En síntesis, Aquarius argumentó que la Ley Núm. 252, supra, salvaguarda la industria del turismo y la calidad de los planes de derecho de multipropiedad y clubes vacacio-nales en Puerto Rico. Indicó que el estatuto provee hasta un máximo de dieciocho meses adicionales a la fecha infor-mada por el desarrollador para terminar los alojamientos y las instalaciones.(1) Asimismo, expuso que el derecho de cancelación del contrato había expirado, no existía nin-guna razón para su resolución y no incurrió en una prác-tica engañosa porque cumplió con todos los requisitos de la citada ley.
*538 El 29 de abril de 2009, el Tribunal de Apelaciones emitió una sentencia en la cual revocó a D.A.Co. El foro interme-dio concluyó que, según dispone la Ley Núm. 252, supra, Aquarius contaba con un término adicional de dieciocho meses al informado en el ofrecimiento público para tener las instalaciones terminadas. El foro apelativo intermedio determinó que Aquarius cumplió con los requisitos para ser acreedor de ese periodo adicional, según evidencia la certificación emitida por la Compañía de Turismo. Deter-minó que el hecho de que Aquarius no “informara en deta-lle lo que establece la Ley aplicable al negocio jurídico en el que la parte recurrida [Silva-Alicea] se estaba involu-crando no implica que indujo al comprador a error y viciara su consentimiento”. Además, decretó que los esposos Silva-Alicea se debieron informar adecuadamente, ya que el des-conocimiento de la ley no exime de su cumplimiento.
Inconformes, los esposos Silva-Alicea acudieron ante este foro y señalaron que el Tribunal de Apelaciones erró al no suplir las deficiencias de la Ley Núm. 252, supra, por-que no aplicó el principio de buena fe a la relación contractual, a pesar de que Aquarius no divulgó que las instala-ciones no estarían construidas para el disfrute de éstos en el 2006. Asimismo, cuestionó que el foro intermedio les im-pusiera una obligación adicional a los adquirientes de este tipo de propiedad, en contravención al propósito de la ley.
En reconsideración, el 19 de marzo de 2010 este Tribunal expidió el recurso. Con el beneficio de la comparecencia de las partes, procedemos a adjudicar la controversia planteada.
II
A. Los orígenes de los planes de derecho de multipro-piedad y clubes vacacionales responden a la necesidad de buscar alternativas a las formas tradicionales para vacacionar. En Estados Unidos, sus inicios se remontan a *539 la década del setenta como resultado de la necesidad de atender los cambios económicos que enfrentaba la sociedad. La proliferación de este tipo de negocio incre-mentó a tal grado que creó la necesidad de implantar le-gislación para regular la industria y las técnicas de ventas utilizadas para su promoción.(2) Véanse: D.A. Bowen, Timeshare Ownership: Regulation and Common Sense, 18 Loy. Consumer L. Rev. 459 (2006); A.S. Burek, Uniform Real Estate Time-Share Act, 14 Real Prop. Prob. & Tr. J. 683 (1979).
Al igual que otras jurisdicciones, y constituyendo la in-dustria turística un elemento importante en el desarrollo económico de Puerto Rico, la Asamblea Legislativa mostró interés en promulgar legislación con relación a la industria de multipropiedad y clubes vacacionales con el propósito dual de promoverla y proteger a sus compradores. Con ese fin, la Ley Núm. 252, supra, uniformó y reglamentó este sector económico y los derechos de los consumidores locales y extranjeros. Sec. 1-102 de la Ley Núm. 252 (31 L.P.R.A. sec. 1251). La promulgación del estatuto responde a la in-tención de uniformar y gobernar exclusivamente, con una sola ley, este tipo de industria. Véase Ponencia de la Com-pañía de Turismo de 24 de agosto de 1995 relacionada al P. de la C. 2088, pág. 2. De esta forma se notifica tanto al consumidor local como al extranjero en un solo cuerpo legal los derechos y las obligaciones de cada una de las partes.
La elaboración de la Ley Núm. 252, supra, constituyó un ejercicio que contó con el beneficio del conocimiento de los desarrolladores de proyectos en Puerto Rico y de otras jurisdicciones. Igualmente, durante el proceso legislativo de aprobación, participaron agencias representativas del interés público, tales como el Departamento de Justicia, el *540 D.A.Co. y la Compañía de Turismo.(3) Además, se recurrió como base a las leyes modelos de la American Resort Development Association (ARDA)(4) y la National Association of Real Estate Licensed Law Officials (NARELLO).(5) Éstas sirvieron, a su vez, como modelo para promulgar estatutos similares en varias jurisdicciones dirigidos a reglamentar esta industria. Asimismo, los legisladores estudiaron las particularidades de nuestro sistema de derecho civil y la legislación que atiende la propiedad horizontal en nuestra jurisdicción para incluir disposiciones que no se encuen-tran presentes en los modelos seguidos y que responden a nuestras particularidades legales. Véase Ponencia de la Compañía de Turismo, supra.
 En términos generales, la Ley Núm. 252, supra, dispone que el régimen de multipropiedad o club vacacio-nal se establezca mediante escritura pública inscrita en el Registro de la Propiedad. El mencionado régimen se puede estructurar como un derecho contractual para usar y ocu-par el alojamiento objeto de éste, o urna clase especial de derecho de propiedad con derecho de usar y ocupar un alo-jamiento en particular. Sec. 1-103 de la Ley Núm. 252 (31 L.P.R.A. 1251a). A su vez, el estatuto requiere un permiso expedido por la Compañía de Turismo para que un desa-rrollador o vendedor pueda ofrecer o disponer del derecho de multipropiedad, del derecho vacacional o alojamiento a un comprador potencial en Puerto Rico o sobre este tipo de propiedad localizada en Puerto Rico. Sec. 2-101 de la Ley *541 Núm. 252 (31 L.P.R.A. sec. 1252). Esta ley atiende lo rela-cionado al método de administración del plan de derecho de multipropiedad o club vacacional, la forma como se es-tablecen, cobran y pagan las cuotas de los gastos comunes, el método de operación del sistema de reservaciones, el procedimiento a seguir para el relevo de las funciones a la entidad administradora, las prácticas proscritas, los pro-gramas de intercambio y los poderes de la Compañía de Turismo.
En lo relevante a la situación ante nuestra consideración, la Ley Núm. 252, supra, confiere unas salvaguardas a los consumidores de este tipo de industria. Las mismas están dirigidas a cumplir con uno de los propósitos de la ley especial de proteger a los consumidores. Entre éstas, el desarrollador debe evidenciar a la Compañía de Turismo que el alojamiento particular objeto del derecho de multipropiedad o derecho vacacional está protegido; es decir, que está libre de las reclamaciones de cualquier tenedor de gravámenes, excepto en las situaciones dispuestas por el propio estatuto. Sec. 4-101 de la Ley Núm. 252 (31 L.RR.A. sec. 1254). Igualmente, la legislación impone al desarrollador la obligación de depositar en una cuenta en plica (escrow account) todos los depósitos recibidos por los compradores de derecho de multipropiedad, derechos vacacionales o alojamiento hasta que transcurra el periodo de rescisión establecido en la ley. Sec. 3-102 de la Ley Núm. 252 (31 L.P.R.A. sec. 1253a).
Lo anterior nos remite al derecho de cancelación que tienen los compradores al amparo de la Ley Núm. 252, supra. Con el propósito dual de impulsar este tipo de mercado, y proteger al consumidor local y extranjero, nuestro estatuto incorporó la experiencia de otras jurisdicciones. Como consecuencia, el legislador adoptó un término de siete días en el cual el comprador tiene la potestad absoluta de rescindir el acuerdo de compraventa de un derecho de multipropiedad o club vacacional. Este periodo permite *542 que el comprador impulsivo recapacite (cooling-off) sobre una decisión para adquirir este tipo de derecho propietario en respuesta a las prácticas persistentes de ventas que se utilizan para atraerlos. Además, le permite evaluar el com-promiso contractual contraído y optar por desistir de la obligación si determina que ésta no satisface todas sus ex-pectativas o resultaría en una carga onerosa a su capacidad económica. Véanse: Ponencia del Departamento de Asuntos del Consumidor de 24 de agosto de 1995 relacio-nada al P. de la C. 2088, pág. 1; E.A. Cameron y S. Maxwell, Protecting Consumers: The Contractual and Real Estate Issues Involving Timeshares, Quarter shares, and Fractional Ownerships, 37 (Núm. 4) Real Est. L.J. 278, 297 (2009).
El periodo de rescisión absoluto es de tal importancia que la reglamentación exige que se informe conspicuamente antes del lugar designado para la firma del comprador.(6) El comprador no puede renunciar al derecho de rescisión en el término de siete días provisto por la Ley Núm. 252, supra. Esta ley dispone, expresamente, que cualquier documento o acción que pueda implicar una renuncia a este derecho se considera nula y sin efecto. Secs. 3-101 y 4-103 de la Ley Núm. 252 (31 L.P.R.A. secs. 1253 y 1254b). Véanse, además: Bowen, supra, págs. 474-475; E.R. Peirce y R.A. Mann, Time-Share Interests in Real Estate: A Critical Evaluation of the Regulatory Environment, 59 (Núm. 1) Notre Dame L. Rev. 9, 51 (1983).
Además del término de rescisión de siete días de *543 la Sec. 3-101 de la Ley Núm. 252, supra, nuestra jurisdic-ción reconoce mayor protección a los consumidores al pro-mulgar un derecho a cancelar el contrato de compraventa si el desarrollador no culmina los alojamientos que son ob-jeto del contrato de compraventa o el derecho de multipro-piedad o vacacional en los dieciocho meses siguientes a la fecha estimada por el desarrollador para terminar el aloja-miento o las instalaciones. En caso de ejercer el derecho de extender la fecha estimada, el desarrollador debe solicitar la aprobación por escrito a la Compañía de Turismo. Debe incluir los costos relacionados con la terminación del aloja-miento, el tiempo estimado que necesita para ello con copia del contrato de construcción otorgado para terminar la construcción, evidencia satisfactoria de los fondos para completarla, una fianza y una carta de crédito que acredite la disponibilidad de activos netos para asegurar el cumplimiento. Véase, además, Sec. 4-103 de la Ley Núm. 252, supra. (7)
Lo expuesto demuestra que no existe polémica en *544 cuanto a que la Ley Núm. 252, supra, otorga un derecho de rescisión absoluto al comprador a cancelar el contrato en el término de siete días desde que se otorgó el contrato de compraventa. Tampoco se debe cuestionar que el estatuto otorga al desarrollador un término adicional de dieciocho meses para terminar la construcción de las instalaciones y el derecho del comprador a cancelar el contrato si los alo-jamientos no se completan dentro de ese periodo. La inte-rrogante que se genera ante nuestra consideración es si el desarrollador tiene la obligación de divulgar el hecho de que la Ley Núm. 252, supra, le confiere ese término adicio-nal a la fecha informada para completar las instalaciones y cómo ello afecta a la buena fe y el consentimiento prestado al otorgar el contrato de compraventa.
B. A estos efectos, el examen de la Ley Núm. 252, supra, refleja que ésta regula los requisitos de forma y con-tenido del documento de ofrecimiento público que la Compañía de Turismo debe aprobar y proveer a los compradores antes de otorgar el contrato de compraventa. Sec. 5-101 de la Ley Núm. 252 (31 L.P.R.A. sec. 1255). Me-diante este documento se divulgan de forma completa y precisa todas las características materiales del plan de de-recho de multipropiedad o club vacacional para que el con-sumidor posea una fuente fidedigna que corrobore la vera-cidad de los términos y las condiciones que contrate o la oportunidad de evaluar otros planes y las ofertas disponi-bles previo a realizar una selección. Ponencia del Departamento de Asuntos del Consumidor, supra. De igual forma, *545 la legislación codifica las divulgaciones mínimas que se de-ben realizar a los compradores. Sec. 5-102 de la Ley Núm. 252 (31 L.P.R.A. sec. 1255a).(8)
Dentro de las divulgaciones mínimas requeridas en be-neficio del comprador, el legislador consideró algunas ins-tancias relacionadas —como la de autos— en las que se adquiere el derecho de multipropiedad o de clubes vacacio-nales antes de que las instalaciones estén terminadas. A estos efectos, la Ley Núm. 252, supra, dispone como sigue:
Cada documento de ofrecimiento público radicado en la Compañía, conjuntamente con cualesquiera enmiendas del mismo, deberá divulgar completa y precisamente todas las ca-racterísticas materiales del plan de derecho de multipropiedad o club vacacional. Como mínimo, deberá contener los siguien-tes componentes e información actual, efectiva a la fecha de emisión por la Compañía del permiso para un plan de derecho de multipropiedad o club vacacional de acuerdo con las dispo-siciones de las sees. 1252 a 1252j de este título:
(7) Una descripción de cada lugar base y de los alojamien-tos [e instalaciones] protegidos comprendidos en el plan de derecho de multipropiedad o club vacacional del que se trate, en forma resumida, que incluya para cada lugar base lo si-guiente:
*546 (e) Si la construcción de los alojamientos o [instalaciones] no ha sido aún terminada, o cualquier alojamiento o facilidad por cualquier razón no está disponible para uso u ocupación, la fecha estimada más tardía en que estará disponible. Sec. 5-102 de la Ley Núm. 252 (31 L.P.R.A. sec. 1255a(7)(e)).
El desarrollador debe incluir junto con su solicitud de permiso presentada a la Compañía de Turismo para que lo autorice a ofrecer un plan de multipropiedad o club vacacional, el documento de ofrecimiento público para su aprobación. De lo transcrito surge que la Ley Núm. 252, supra, requiere que como parte de las divulgaciones mínimas que deben constar en el ofrecimiento público se incluya la fecha estimada en la que el desarrollador proyecta estarán disponibles para uso las instalaciones. El momento en el cual se proyecta que estará disponible una instalación es información cardinal para el comprador. Tanto es así que la Ley Núm. 252, supra, establece que representar indebida o engañosamente cuándo los componentes del plan estarán disponibles para los titulares constituye una práctica prohibida a la industria. Sec. 7-104(2)(e)(i) de la Ley Núm. 252 (31 L.P.R.A. sec. 1257c(2)(e)(i)). Así, el desarrollador que informa una fecha estimada que a todas luces no podrá cumplir infringe con los deberes que le impone la Ley Núm. 252, supra.
Al revisar la Ley Núm. 252, supra, resalta que el legislador no requirió que el desarrollador informara sobre su derecho a completar los alojamientos e instalaciones dentro de un término adicional de dieciocho meses a la fecha estimada debidamente informada al comprador. El hecho de que la Ley Núm. 252, supra, le imponga al desarrollador el deber de informar la fecha estimada en la que estará disponible el proyecto no implica que éste deba advertir sobre el derecho que le proporciona la propia ley para culminar las instalaciones en el tiempo adicional que dispone el estatuto. La razón para ello es sencilla: la aprobación y publicación de la Ley Núm. 252, supra, constituye *547 notificación suficiente para que el comprador conozca de sus derechos y los del desarrollador sobre la propiedad que adquiere a su amparo. La ley advierte al consumidor en forma diáfana que un desarrollador tiene un término mayor al informado para terminar las instalaciones. Claro está, como la legislación lo que dispone son unas divulga-ciones mínimas, nada impide que el desarrollador informe voluntariamente sobre tal derecho a los compradores que adquieren este tipo de propiedad. Ello tampoco implica una carta en blanco que avale las actuaciones de un desa-rrollador que amparado en su derecho propicie un engaño.
Aunque ciertamente la ley especial no requiere al desa-rrollador que informe sobre el término adicional que ésta le concede para completar las instalaciones, debemos exami-nar —según el estatuto y las circunstancias particulares del caso— si no hacerlo constituye una violación al princi-pio de buena fe que impone la Ley Núm. 252, supra, en este tipo de contratación.
C. Es imprescindible destacar que la Ley Núm. 252, supra, impone una obligación de buena fe a los contratos que rige. Esto significa que haya honestidad de hecho y la observación de normas de trato justo en su cumplimiento o aplicación. Sec. 10-102 de la Ley Núm. 252 (31 L.P.R.A. sec. 1260a). La buena fe significa que las partes están obligadas a actuar honrada y lealmente. Supone guardar la fidelidad de la palabra dada y no defraudar la confianza ni abusar de ella para que la negociación refleje una voluntad que no sea producto de la malicia y del engaño. L. Diez-Picazo, La doctrina de los propios actos, Barcelona, Ed. Bosch, 1963, pág. 157. Véanse: S.L.G. Ortiz-Alvarado v. Great American, 182 D.P.R. 48 (2011); VDE Corporation v. F & R Contractors, 180 D.P.R. 21, 34 (2010); Colón v. Glamourous Nails, 167 D.P.R. 33, 44—47 (2006).
La buena fe permea en todo el proceso de contratación desde sus fases iniciales preparatorias, durante la negociación del contrato propiamente y en su cumplí- *548 miento. Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 526-528 (1982). La aplicación del principio de buena fe en materia de cumplimiento contractual surge cuando una parte invoca una razón por la cual alega que se justifica variar su prestación afectando la relación contractual con la otra parte, pero que no se debe calificar como incumplimiento. M.J. Godreau Robles, Lealtad y buena fe contractual, 58 (Núm. 3) Rev. Jur. U.P.R. 367, 383 (1989).
Cuando se viola el principio de buena fe se puede viciar el consentimiento de la otra parte contratante. Esto incluye no revelar hechos importantes durante un proceso de negociación que muy bien pudieron conllevar a una contratación que de otra forma no hubiese tenido lugar. En estos casos, el principio de buena fe se invoca porque la oferta o publicidad no responde a las exigencias de lealtad y honestidad. Godreau, supra, págs. 419-420; Véanse: García Reyes v. Cruz Auto Corp., 173 D.P.R. 870, 886 (2008); Bosques v. Echevarría, 162 D.P.R. 830, 836 (2004); Márquez v. Torres Campos, 111 D.P.R. 854, 865 (1982).(9)
Ahora bien, no toda omisión conlleva la nulidad de la contratación. Para que ello proceda resulta necesario que la falta de información sobre determinado hecho recaiga sobre elementos esenciales del contrato que hubieran evi-tado a la otra parte prestar su consentimiento para la contratación. En ese caso, las partes deberán restituirse —recíprocamente— las cosas otorgadas al momento del contrato. Véanse: S.L.G. Ortiz-Alvarado v. Great American, supra; García Reyes v. Cruz Auto Corp., supra, págs. 886-887.
De otra parte, tampoco podemos olvidar que el *549 principio de buena fe impone un ejercicio de moderación a la posibilidad de la resolución de un contrato. Esa práctica responde a aquellos casos en los que el incumplimiento ale-gado no es absoluto o no involucra la razón principal por la cual se obligaron las partes. Véanse: Alvarez v. Rivera, 165 D.P.R. 1, 19-20 (2005), citando a L. Diez-Picazo y A. Gullón, Sistema de Derecho Civil, 4ta ed. rev., Madrid, Ed. Tecnos, 1983, Vol. II, págs. 226-227. Así, en aquellas ins-tancias en las que la prestación resulta defectuosa, y ello no conlleva un incumplimiento absoluto, debe “moderarse el impulso hacia la resolución, pues podría ocurrir una in-justicia ...”. J.R. Vélez Torres, Derecho de obligaciones: curso de Derecho Civil, 2da ed., San Juan, Programa de Educación Jurídica Continua de la Universidad Interame-ricana, 1997, pág. 76. Por lo que en estos casos procede un remedio balanceado sobre los daños causados sin llegar al extremo de la resolución del contrato. Id. y pág. 77; 31 L.P.R.A. sec. 3018.
En cuanto a los remedios que provee la Ley Núm. 252, supra, el estatuto reconoce que cuando el tribunal deter-mina que una cláusula del contrato fue irrazonable podrá rehusar hacer valer el contrato, hacer valer el resto de éste sin la cláusula irrazonable, o limitar su aplicación con el propósito de evitar un resultado injusto. Sec. 10-101 de la Ley Núm. 252 (31 L.P.R.A. sec. 1260). Al aplicar los reme-dios provistos por la legislación especial, éstos se deben administrar liberalmente de forma tal que la parte agra-viada sea colocada en una posición tan buena como lo es-taría si la otra parte hubiera cumplido perfectamente con su obligación. Sec. 10-103 de la Ley Núm. 252 (31 L.P.R.A. sec. 1260b).
Recordamos que el propósito de nuestra legislación es dual: promover la industria de multipropiedad y clubes va-cacionales, así como proteger a sus consumidores. En aten-ción a ello, es nuestra función crear un balance entre estos intereses de forma tal que se proteja a los compradores en *550 esa industria a la vez que fomentemos su crecimiento y estabilidad.
III
Con el marco doctrinal antes expuesto, debemos anali-zar los hechos ante nuestra consideración.
Los esposos Silva-Alicea adquirieron el 3 de abril de 2005 la segunda semana de junio de 2006 para su uso anual durante un término de sesenta años en el complejo vacacional Boquerón Beach Resort. Las partes acordaron que ese derecho comenzaría a utilizarse a partir del 2006. De igual forma, a los esposos Silva-Alicea se les informó mediante el contrato de compraventa y el ofrecimiento pú-blico aprobado por la Compañía de Turismo que la cons-trucción de las instalaciones y los alojamientos no estaban terminados y que se esperaba completarlos durante la pri-mera mitad del 2006. Para ello, los esposos Silva-Alicea pagaron $10,225. Posteriormente, los esposos Silva-Alicea hicieron las gestiones para utilizar la semana adquirida. (10) A esta fecha, las instalaciones no estaban terminadas, por lo que no pudieron disfrutar el derecho vacacional adquirido. Como consecuencia, para agosto solicitaron la cancelación del contrato.
Los hechos demuestran que Aquarius cumplió con los requisitos de la Ley Núm. 252, supra, al divulgar la fecha estimada para completar las instalaciones. De igual forma, surge que Aquarius no informó a los compradores que la ley le concedía un término adicional de dieciocho meses para terminar la construcción de éstas. En efecto, Aquarius ejerció el derecho concedido por el estatuto, según consta de la certificación emitida por la Compañía de Tu-rismo, y culminó la edificación de las instalaciones pocos meses después, en noviembre de 2006.
*551 Los esposos Silva-Alicea no cuestionan el contrato ni los documentos que les entregaron, por lo que éstos no están en controversia. Alegan que no hubieran adquirido su de-recho de multipropiedad de haber conocido que las instala-ciones no iban a estar disponibles para el verano del 2006. Los esposos Silva-Alicea exponen ante este Tribunal que aunque la Ley Núm. 252, supra, le concede dieciocho me-ses al desarrollador para la construcción de las instalacio-nes del club vacacional desde la fecha estimada, éste debió divulgar dicho término a base del principio de buena fe. Reconocen que esta ley no le impone al desarrollador la obligación de informar sobre el término adicional para completar las instalaciones. Asimismo, cuestionan las ex-presiones del foro apelativo intermedio en cuanto a que éstos debían informarse adecuadamente.
Los esposos Silva-Alicea pretenden resolver el contrato arguyendo que se violó el principio de buena fe para soste-ner que procede su resolución. Con el único fin de atender tal reclamo, y revisado cuidadosamente el expediente ante nuestra consideración, encontramos que no existe razón que nos permita inferir que Aquarius violó el principio de buena fe ni colegir que el motivo para adquirir el derecho vacacional de sesenta años fue exclusivamente para disfru-tarlo en el verano de 2006. Tampoco podemos deducir que la disponibilidad del complejo para esa fecha fuera el factor determinante para contratar, ni que al momento de otorgar el contrato, Aquarius representara indebidamente o incu-rriera en una práctica engañosa porque conociera que las instalaciones no estarían completadas para la semana ad-quirida por los esposos Silva-Alicea, o que al momento de estimar la fecha informada pudiera prever que no culmi-naría su construcción.
Al examinar las actuaciones que realizó Aquarius, surge que cumplió con todos los deberes que impone la Ley Núm. 252, supra, y ofreció toda la divulgación requerida por el estatuto a los esposos Silva-Alicea. El contrato estableció *552 claramente que las instalaciones no estaban terminadas y que la Ley Núm. 252, supra, regía el régimen adquirido. De igual forma, Aquarius hizo formar parte del acuerdo el documento de ofrecimiento público que contó con el aval de la Compañía de Turismo. En el documento de ofrecimiento público entregado a los esposos Silva-Alicea consta la fecha estimada que Aquarius proyectó para finalizar las instalaciones. El desarrollador no informó a los esposos Silva-Alicea de su derecho a completar las instalaciones en un periodo mayor, según dispone el estatuto especial. Clara-mente expuso —como exige la Ley Núm. 252, supra— el derecho de resolución del contrato en el término de siete días a partir de la firma del contrato de compraventa. Como vimos, el legislador no exigió en la Ley Núm. 252, supra, que el desarrollador informara sobre su derecho a finalizar las instalaciones en una fecha posterior a la estimada. Sin embargo, al cumplir con las exigencias del estatuto, Aquarius estableció e informó a los esposos Silva-Alicea la fecha estimada para completar las instalaciones para mediados del 2006. De esta forma, cuando los esposos Silva-Alicea firmaron el contrato pudieron considerar la probabilidad de circunstancias fuera del control de Aquarius que le impedirían cumplir con lo proyectado e impedi-rían el disfrute del derecho adquirido durante la segunda semana del mes de junio de 2006.
Como hemos examinado, la ley reconoce la eventualidad de que un desarrollador no pueda culminar las instalacio-nes en el tiempo estimado. Por ello, el estatuto le reconoce un término adicional de dieciocho meses para completar los alojamientos. A su vez, consideró que un exceso de ese periodo podría afectar el derecho de los consumidores al disfrute de su propiedad, por lo que les reconoció la potes-tad de cancelar el contrato si ello ocurriese. Aquarius ejer-ció su derecho a contar con un tiempo adicional para com-pletar las instalaciones. Estas se culminaron en noviembre de 2006, es decir, a tan solo seis meses de la fecha *553 proyectada. El que Aquarius se beneficiara de las disposi-ciones contenidas en la Ley Núm. 252, supra, no implica que actuó violentando el principio de buena fe.
En el caso de autos no existe indicio de que Aquarius violara el principio de buena fe. El hecho de no informar a los esposos Silva-Alicea lo que dispone la Ley Núm. 252, supra, no constituye un incumplimiento de la ley ni un quebrantamiento del deber de la lealtad y honestidad. Al hacer un balance de los intereses contrapuestos, resalta que el contrato y el ofrecimiento público entregados a los compradores claramente disponían que aplicaba la Ley Núm. 252, supra, porque las instalaciones no estaban cons-truidas y la fecha estimada para terminarlas era mediados del 2006. No existe prueba de que al momento de otorgar el contrato Aquarius supiera o pudiera prever que no podría cumplir con la fecha estimada. La buena fe se presume e impone a todas las partes un deber recíproco. Una parte no puede pretender ampararse en el principio de buena fe para justificar su desconocimiento y de esta forma evitar el cumplimiento con lo pactado. Ello atentaría contra el prin-cipio de toda obligación contractual. Pretender o inferir lo contrario impondría sobre Aquarius un deber no conside-rado por nuestro legislador, cuyo efecto le impediría el dis-frute de un derecho reconocido por la ley especial para cul-minar las instalaciones en el periodo establecido por el estatuto.
El desarrollador de un club vacacional o un derecho de multipropiedad no está obligado por la Ley Núm. 252, supra, a informar al comprador del tiempo adicional que le concede la ley especial para completar unas instalaciones que no están terminadas al momento de ofrecerlas. Su deber es informar la fecha estimada en la que proyecta que éstas estarán disponibles. De acuerdo con el principio de buena fe habrá situaciones en las que el desarrollador deberá informar sobre cualquier situación que afecte la fecha estimada y comunicada a los futuros compradores al *554 momento de otorgar el contrato. La evaluación de estas circunstancias se hará conforme a la prueba presentada y a los hechos particulares de cada caso.
Según el escenario antes expuesto, concluimos que Aquarius actuó conforme a la Ley Núm. 252, supra, y no infringió el principio de buena fe que permea en este tipo de contratación.
A pesar de lo anterior, consideramos que Aquarius no tenía la obligación de fijar una fecha cierta de entrega y de comienzo para el disfrute del derecho vacacional adquirido. Nótese que las partes acordaron que ese derecho se comen-zaría a utilizar a partir del 2006, por lo que los esposos Silva-Alicea pagaron la cuota de mantenimiento y las par-tes establecieron el 2006 como la fecha base para el cóm-puto por sesenta años de su derecho vacacional. La propie-dad no estuvo disponible para su uso durante el 2006. Tal incumplimiento no frustra el fin del negocio pactado, por lo que no procede la resolución del contrato sino la compen-sación del daño que ello causó al matrimonio.
En consecuencia, procede que lo pagado con relación a la propiedad durante el 2006 se aplique a los gastos de mantenimiento que corresponde al matrimonio para años futuros. Igualmente, el periodo de uso de sesenta años no puede ser computado desde el 2006 porque las instalacio-nes no estuvieron disponibles para su disfrute. Siendo ello así, este periodo comenzó a transcurrir desde que los espo-sos Silva-Alicea pudieron haber disfrutado de su derecho vacacional, es decir, desde el verano (junio) de 2007, ya que las instalaciones estuvieron disponibles en noviembre de 2006. De esta forma cumplimos con el principio reconocido de que no toda omisión conlleva la nulidad de contratación a menos que recaiga sobre elementos esenciales del con-trato, al igual que la disposición estatutaria contenida en la Ley Núm. 252, supra, de colocar a la parte agraviada en una posición tan buena como lo estaría ante un cumpli-miento perfecto. Sec. 10-103 de la Ley Núm. 252, supra. *555 Así, cumplimos con el propósito dual que persigue la Ley Núm. 252, supra, de promover este tipo de industria y pro-teger a los consumidores.
IV
Por lo anterior, modificamos la sentencia del Tribunal de Apelaciones a los únicos efectos de que Aquarius deberá acreditar al matrimonio Silva-Alicea lo pagado en concepto de gastos de mantenimiento para el 2006 a un año futuro; además, el derecho adquirido de propiedad por sesenta años se entenderá que comenzó desde junio de 2007 cuando los esposos Silva-Alicea efectivamente pudieron disfrutarlo. Así modificada, se confirma.
La Jueza Asociada Señora Pabón Charneco disintió con una opinión escrita, a la cual se unieron los Jueces Asocia-dos Señores Rivera García y Feliberti Cintrón.

 Según surge del expediente, Aquarius Vacation Club (Aquarius) informó a la Compañía de Turismo que no culminaría las instalaciones dentro del período estimado. Véase Certificación emitida por la Compañía de Turismo el 20 de noviem-bre de 2007, Apéndice, pág. 168.

 Para el 2004 en Estados Unidos se estimó en cerca de $7.9 billones la indus-tria de multipropiedad y clubes vacacionales. D.A. Bowen, Timeshare Ownership: Regulation and Common Sense, 18 Loy. Consumer L. Rev. 459, 463 (2006).

 Véanse: Ponencia del Departamento de Justicia de 29 de agosto de 1995, relacionada al P. de la C. 2088; Ponencia del Departamento de Asuntos del Consu-midor de 24 de agosto de 1995, relacionada al P. de la C. 2088; Ponencia de la Compañía de Turismo de 24 de agosto de 1995, relacionada al P. de la C. 2088.

 La American Resort Development Association fue fundada en 1969 para re-presentar la industria vacacional en Estados Unidos. Hoy es una asociación recono-cida internacionalmente como la organización más destacada para promover el de-sarrollo de este tipo de industria.

 La National Association of Real Estate Licensed Law Officials es una funda-ción oficial que sirve para licenciar agentes de bienes raíces para cumplir con las leyes de este campo.

 La Ley Núm. 252-1995 define conspicuo de la forma siguiente:
“(a) Tipo en letras mayúsculas y minúsculas que no sea de tamaño menor [de] dos (2) puntos [de] tipo más grandes que el tipo de tamaño más grande, sin contar los encabezamientos, en la página donde aparece, pero en todos los casos que no sea menor de diez (10) puntos, o
“(b) donde el uso de un tipo de tamaño de diez (10) puntos sería impráctico o imposible con respecto a un material escrito en particular, entonces el estilo de tipo o de impreso que la Compañía apruebe específicamente, siempre y cuando el tipo siga siendo conspicuo bajo las circunstancias”. Sec. 1-104(13) de la Ley Núm. 252 (31 L.P.R.A. sec. 1251b(13)).

 La Sec. 4-103 de la Ley Núm. 252, supra, 31 L.P.R.A. sec. 1254b, dispone como sigue:
“(1) Un desarrollador deberá completar todos los alojamientos [e instalaciones], la futura disponibilidad de los cuales se le representa por él o [en] su nombre a los compradores, bien sea en los documentos del plan de derechos de multipropiedad o club vacacional, en material de promoción o de publicidad, en declaraciones orales o escritas o por cualquier otro medio dentro de los dieciocho (18) meses siguientes a la fecha designada por el desarrollador de acuerdo con lo provisto en el inciso (2)(b) de esta sección.
(2) Un desarrollador deberá radicar con la Compañía la siguiente información en relación con cualquier alojamiento o [instalación] que no esté terminado para la fecha en que se haga cualquier representación sobre el mismo:
(а) Una declaración escrita divulgando todos los costos envueltos en la terminación del alojamiento o [instalación] de que se trate.
(б) Una declaración escrita en que se indique el tiempo estimado que se necesita para la terminación del alojamiento o [instalación] de que se trate.
(c) Una copia del contrato de construcción otorgado y cualesquiera otros contratos otorgados para la terminación del alojamiento o [instalación].
(d) Evidencia satisfactoria de la disponibilidad de fondos suficientes para completar dicho alojamiento o [instalación] que consistirá de:
(¿) Una fianza de pago y cumplimiento por una cantidad igual al cien por ciento (100%) del costo anticipado para la terminación del alojamiento o [instalación] de que se trate. Cualquier fianza de tal naturaleza será emitida por un fiador o compañía de seguros autorizado a hacer negocios en Puerto Rico y que tenga suficientes activos netos como para ser aceptable para la Compañía, o
*544 (ii) una carta de crédito por la cantidad especificada en el párrafo (i) anterior emitida por un banco, una asociación de ahorros y préstamos o cualquier otra institución financiera autorizada a hacer negocios en Puerto Rico asegurada por una dependencia del gobierno federal y que tenga suficientes activos netos como para ser aceptable para la Compañía.
Cualquier fianza o carta de crédito de la naturaleza antes descrita será irrevocable hasta tanto el desarrollador complete el alojamiento o [instalación] prometido. De ser necesario para la Compañía acudir a la fianza o carta de crédito para asegu-rar la terminación del alojamiento o [instalación], la Compañía tendrá autoridad para solicitar de un tribunal con jurisdicción y competencia el nombramiento de un síndico para que se encargue de dirigir y administrar dicha terminación”.

 En términos generales, las divulgaciones mínimas requeridas por la Ley Núm. 252, supra, incluyen: (1) el nombre y la dirección principal del desarrollador y del plan adquirido; (2) el número de años que el desarrollador ha estado en los negocios en general y en la industria de turismo y entretenimiento; (3) la experiencia del desarrollador en administración; (4) la entidad administradora seleccionada; (5) el término de duración de los derechos de los titulares; (6) la descripción del sistema de reservaciones y de las reglas y los reglamentos adoptados; (7) la descripción de los. alojamientos e instalaciones incluidas en el plan relacionado; (8) los alojamientos incidentales; (9) la información relacionada con la administración del plan, incluso las cuotas, los derechos o los cargos corrientes; (10) la naturaleza legal del derecho adquirido; (11) una declaración notoria de que el derecho adquirido no es apropiado para inversión ni para obtener ganancias y que tampoco está sujeto a las disposicio-nes de la Ley de Propiedad Horizontal, Ley Núm. 103-2003 (31 L.P.R.A. sec. 129 et seq.)\ (12) la descripción de los gravámenes que afecten los alojamientos o las insta-laciones; (13) la descripción del tipo de financiamiento; (14) los procedimientos dis-ponibles para ejecución y venta del derecho sobre alojamiento en caso de incumpli-miento, y (15) si el desarrollador ha realizado o tiene la intención de hacer una reserva de dedicación de uso. Sec. 5-102 de la Ley Núm. 252, supra, 31 L.P.R.A. sec. 1255a.

 Nótese que estos casos se atendieron según la figura del dolo. Existe dolo cuando con palabras o maquinaciones insidiosas de parte de uno de los contratantes se induce a otro a celebrar un contrato que no hubiera hecho. Al definir esta figura hemos expresado que el dolo incluye un “complejo de malas artes, contrario a la honestidad e idóneo para sorprender la buena fe ajena ...”. Véase Colón v. Promo Motor Imports, Inc., 144 D.P.R. 659, 666 (1997).

 Del expediente no surge cuándo se hicieron estas gestiones.