

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Comisionado de Seguros de Puerto Rico<br><br>    Recurrido<br><br>            v.<br><br>Universal Insurance Company, Inc.<br><br>    Peticionaria | Certiorari<br><br>2012 TSPR    165<br><br>18 7  DPR _____ |

Número del Caso:        CC- 2010 - 413

Fecha: 1ro de noviembre de 2012

Tribunal de Apelaciones:

            Región Judicial de Bayamón

Abogados de la Parte Peticionaria:

            Lcdo. Pedro I Vidal Cordero
            Lcda. Deborah Castillo Díaz
            Lcdo. Francisco Rebollo López

Abogados    de la Parte Recurrida:

            Lcdo. David Castro An          aya
            Lcda. Brenda N. Pérez Fernández

Materia:      Seguros    – Tarifas aprobadas por la Oficina del Comisionado de Seguros en seguros de propiedades para condominios durante el periodo de enero 1996 a junio 2001            ; doctrina de actos propios          .

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electró                nica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| COMISIONADO DE SEGUROS DE PUERTO RICO<br><br>Recurrido<br><br>v.<br><br>UNIVERSAL INSURANCE COMPANY, INC.<br><br>Peticionaria | Núm.: **CC-2010-0413** | *Certiorari* |
| --- | --- | --- |

Opinión del Tribunal emitida por el Juez Asociado señor FELIBERTI CINTRÓN

En San Juan, Puerto Rico, a 1 de noviembre de 2012.

Hoy examinamos si ciertas expresiones verbales atribuidas al Comisionado de Seguros son suficientes para dejar sin efecto las tarifas aplicables a los seguros de propiedad para condominios según previamente aprobadas por la Oficina del Comisionado de Seguros (OCS). Igualmente analizamos si, bajo los contornos de la doctrina de actos propios, le está vedado a los Comisionados de Seguros subsiguientes ir en contra de representaciones hechas por alguno de sus antecesores.

I

Universal Insurance Company, Inc. (Universal o la peticionaria) está facultada por la OCS a llevar a cabo negocios de seguros en Puerto Rico.

Allá para el 11 de julio de 2001, la OCS emitió una Orden de Investigación con el propósito de verificar posibles violaciones al Código de Seguros por parte de Universal relacionadas al monto de las primas cobradas por dicha aseguradora en seguros de propiedad para condominios durante el periodo trascurrido entre **enero de 1996 hasta junio de 2001**. Cerca de un año más tarde, el 8 de mayo de 2002 el Lcdo. Fermín M. Contreras Gómez, quien para esa fecha ocupaba el cargo de Comisionado de Seguros (Comisionado Contreras), emitió una Orden en la cual consignó que, acorde a los hallazgos de la aludida investigación, la peticionaria cobró a algunos de sus clientes primas que estaban ya fuese por debajo o en exceso de las tarifas previamente aprobadas por la OCS para este tipo de seguro.[1] Conforme a lo anterior, la OCS le ordenó a Universal a cesar y desistir de tal conducta; le impuso multas administrativas y le requirió devolver las cantidades cobradas en exceso a ciertos asegurados.

En respuesta, Universal solicitó la celebración de una vista administrativa según provisto en el Artículo 2.220(1)(c) y (2) del Código de Seguros entonces vigente.

---

[1] Ello en contravención con los Artículos 12.130, 27.090(1) y (2), y 27.160(2) y (3) del Código de Seguros de Puerto Rico (Código de Seguros), 26 L.P.R.A. secs. 1213, 2709(1) y (2), y 2716(2) y (3) (2008), respectivamente, para entonces vigentes. En virtud de la Ley Núm. 230-2008, 26 L.P.R.A. sec. 235 (Supl. 2012), la prohibición de rebajas e incentivos no autorizados se encuentra ahora codificada en el Artículo 27.100 del Código de Seguros, 26 L.P.R.A. sec. 2710 (Supl. 2012), mientras que lo atinente al cobro ilegal de primas aparece plasmado en el Artículo 27.160 del Código de Seguros, 26 L.P.R.A. sec. 2716 (Supl. 2012).

26 L.P.R.A. sec. 222(1)(c) y (2) (2008).**2** En su escrito, levantó entre sus defensas que durante la mayor parte del periodo investigado el entonces Comisionado de Seguros Juan Antonio García (q.e.p.d.) (Comisionado García),**3** alegadamente había suspendido el requisito de aprobación previa de tarifas para los seguros de propiedad sobre los condominios.

Previo a celebrarse la vista administrativa, la OCS presentó ante el Oficial Examinador una "Moción para que se Dicte Resolución Parcial Sumaria" en la que planteó que el asunto sobre las violaciones imputadas era apto para disposición sin necesidad de una vista. Universal, por su parte, se opuso argumentando, esencialmente, que existía controversia fáctica sobre si el Comisionado García había suspendido o no el requisito de presentación de tipos para seguros de propiedad sobre condominios, lo cual exigía la celebración de una vista evidenciaria.

Eventualmente, el Oficial Examinador acogió la solicitud de la OCS emitiendo una Resolución Parcial Sumaria mediante la cual determinó que la peticionaria cobró primas que no se ajustaban a los tipos inscritos y aprobados por la OCS, aplicables a los seguros de propiedad para condominios. De igual manera, dictaminó

---

**2**     Esta disposición fue posteriormente enmendada por el Artículo 7 de la Ley Núm. 263-2008, 26 L.P.R.A. sec. 251 (Supl. 2012).

**3**     El Sr. Juan Antonio García (q.e.p.d.) laboró en calidad de Comisionado de Seguros en diferentes ocasiones, siendo la última en **febrero de 1993 hasta febrero de 2001.** Según indicado anteriormente, la investigación pertinente a este recurso cubrió el periodo entre **enero de 1996 hasta junio de 2001.**

que el Comisionado de Seguros no había expedido orden alguna, ni promulgado regla o reglamento suspendiendo o modificando el requisito de presentación de tarifas atinente a los contratos de seguros de propiedad de condominios. Ratificó, por tanto, las violaciones al Código de Seguros imputadas en la Orden impugnada por Universal, mientras que dejó pendiente de determinación el importe de la multa a imponérsele, así como el monto del rembolso correspondiente a las primas cobradas en exceso.

Así las cosas, la OCS sometió nuevamente ante el Oficial Examinador una solicitud de resolución sumaria para disponer sobre el monto de la multa a imponérsele a Universal y la cantidad a ser rembolsada a los asegurados.

Luego de varios trámites procesales, el 7 de diciembre de 2007 la entonces Comisionada de Seguros, Dorelisse Juarbe Jiménez, emitió una Resolución Sumaria mediante la cual le impuso a la peticionaria una multa administrativa de ocho mil dólares ($8,000.00) por haber cobrado primas en exceso a la tarifa manual en la suscripción de ocho (8) pólizas de seguros de propiedad para condominios. Además, le impuso una multa administrativa de cuarenta y dos mil dólares ($42,000.00) por haber concedido rebajas no autorizadas en la suscripción de veintiún (21) pólizas de seguros de propiedad para condominios. Igualmente, le ordenó rembolsar la suma de ciento doce mil trescientos nueve dólares ($112,309.00) a aquellos asegurados a quienes se

les había cobrado primas en exceso de la prima manual. Concluyó que la aprobación o inscripción de una tarifa para determinado tipo de contrato de seguro continuaba en vigor, mientras no fuese revisada formalmente y no se inscribiese la modificación correspondiente.

Inconforme, Universal acudió ante el Tribunal de Apelaciones mediante recurso de revisión administrativa. Reclamó la invalidez de las tarifas en controversia alegando que la OCS había suspendido el requisito de aprobación previa de las mismas. Insistió en la aplicación de la doctrina de actos propios y cuestionó la disposición sumaria del asunto, argumentando que persistían controversias de hechos medulares por resolver.

En su Sentencia de 9 de abril de 2010, el Tribunal de Apelaciones confirmó la Resolución recurrida en todos sus extremos. Decretó que la suspensión de los requisitos de presentación de las tarifas en controversia únicamente podía efectuarse mediante un proceso formal que culminase en algún tipo de orden o reglamentación emitida por la OCS. Por tanto, las expresiones públicas del Comisionado García no eran suficientes para crear un nuevo estado de derecho. Consignó, además, que Universal no podía descansar en la falta de fiscalización de la industria de seguros por parte del Comisionado de Seguros y levantar como defensa la doctrina de actos propios. Como parte de su dictamen resaltó el alto interés público que reviste este campo de nuestra economía, así como lo extensamente

reglamentado que se encuentra.  A base de ello, concluyó que actuó correctamente la OCS al adjudicar sumariamente la disputa, puesto que no existía controversia sobre el hecho de que el requisito de presentación de tarifas continuaba vigente.  Universal recurrió entonces ante este Foro por vía de *certiorari*.[4]

Expedido el auto de *certiorari* y habiendo comparecido ambas partes, procedemos a resolver.

## II

En su alegato, la peticionaria aduce como error que el Tribunal de Apelaciones no reconoció que le cobija la doctrina de actos propios como resguardo a las acciones tomadas por la OCS en su contra.[5]

### A. Doctrina de Actos Propios

A través del Artículo 7 del Código Civil, 31 L.P.R.A. sec. 7 (1993), se le concede a los tribunales la potestad de recurrir a principios generales de derecho basados en equidad para resolver controversias planteadas ante su consideración.  De esta forma, en situaciones apropiadas,

---

[4] Aunque inicialmente la petición de *certiorari* fue declarada *No Ha Lugar* mediante Resolución de 18 de noviembre de 2010, posteriormente, el 24 de enero de 2011 acordamos acoger el recurso en reconsideración.

[5] En el día de hoy nos limitamos a atender el error arriba indicado según señalado en el "Alegato de la Parte Peticionaria", excluyendo de este modo la consideración de la defensa de "entrampamiento" en su vertiente civil administrativa, levantada por vez primera ante este Foro como parte de dicho alegato.  Igualmente, declinamos acoger otros planteamientos traídos por primera vez a nuestra atención mediante la "Réplica al Alegato del Recurrido Comisionado de Seguros de Puerto Rico" sometida por Universal.  Véanse, por ejemplo, Abengoa, S.A. v. American Intl. Ins., 176 D.P.R. 512, 526 (2009) y Echandi Otero v. Stewart Title, 174 D.P.R. 355, 383 n. 15 (2008).

hemos incorporado en nuestra jurisprudencia la regla de que nadie puede ir en contra de sus propios actos. Vivoni Farage v. Ortiz Carro, 179 D.P.R. 990 (2010); Int. General Electric v. Concrete Builders, 104 D.P.R. 871, 873-874 (1976).

Esta norma, calificada en latín como *venire contra factum propium non valet*, permea todo nuestro comportamiento y se encuentra fundamentada en la máxima que exige proceder de buena fe en "el desenvolvimiento de las relaciones jurídicas, el ejercicio de los derechos y el cumplimiento de las obligaciones". Vivoni Farage v. Ortiz Carro, *supra,* pág. 1010 (cita y comillas omitidas). Mediante su aplicación, se salvaguardan intereses esenciales para lograr una efectiva interacción a todos los niveles de la vida diaria. Se espera que el devenir entre los miembros que componen la sociedad esté caracterizado por las cualidades de honestidad y sinceridad, de manera que en todo momento se pueda descansar en la veracidad de las manifestaciones o las actuaciones de otro a base de las cuales se ha actuado. L. Díez Picazo, La Doctrina de los Propios Actos, Barcelona, Ed. Bosch, 1963, pág. 157.

Podemos deducir que, a través de la buena fe se protege la confianza que deposita una parte quien ha confiado razonablemente en una apariencia creada por otra. Int. General Electric v. Concrete Builders, *supra.* J.

Puig Brutau, <u>Estudios de Derecho Comparado, La Doctrina de Actos Propios</u>, Barcelona, Ed. Ariel, 1951, págs. 106-107.

Como bien señala el tratadista Gullón Ballesteros:

> La regla según la cual no puede venirse contra los propios actos, negando todo efecto jurídico a la conducta contraria, se asienta en la buena fe o, dicho de otra manera, en la protección a la confianza que el acto o conducta de una persona suscita objetivamente en otra u otras. El módulo regulador es la objetividad, o sea, el entendimiento o significado que de acuerdo con los criterios generales del obrar en el tráfico jurídico ha de dársele a tal acto o conducta.
>
> El centro de gravedad de la regla no reside en la voluntad de su autor, sino en la confianza generada en terceros, ni se trata (en tal regla) de ver una manifestación del valor de una declaración de voluntad negocial manifestada por hechos o actos concluyentes. No es la regla una derivación de la doctrina del negocio jurídico, sino que tiene una sustantividad propia, asentada en el principio de buena fe.

A. Gullón Ballesteros en I. Sierra Gil de la Cuesta, <u>Comentario del Código Civil</u>, Barcelona, Ed. Bosch, 2000, T. 1, pág. 397.

Se entiende, por tanto, que "[l]a conducta contradictoria es una contravención o una infracción del deber de buena fe". L. Díez Picazo, <u>op. cit.</u>, pág. 143 (nota al calce omitida). Acorde con ello, hemos reconocido que dicha conducta "no tiene lugar en el campo del Derecho, y debe ser impedida". <u>Int. General Electric v. Concrete Builders</u>, *supra,* pág. 877. Véase también, <u>Vivoni Farage v. Ortiz Carro</u>, *supra.*

El vedar que una persona vaya contra sus propios actos tiene como efecto el soslayar "toda la doctrina de

declaración de voluntad para imponer directamente un efecto jurídico". Int. General Electric v. Concrete Builders, *supra,* pág. 877 (nota al calce omitida). "El propósito de la regla es mantener la relación jurídica como fue creada, no permitiendo al obligado su voluntaria contravención." C. L. de Haro, "Cuestiones prácticas, Los 'actos propios' en la Jurisprudencia del Tribunal Supremo", Revista de Derecho Privado, 2da ed., Madrid, Ed. Revista de Derecho Privado, octubre 1913-diciembre 1914, T. 1, pág. 18.

La aplicación de la doctrina de actos propios está sujeta a que concurran los siguientes factores:

> (a) Una conducta determinada de un sujeto, (b) que haya engendrado una situación contraria a la realidad, esto es, aparente y, mediante tal apariencia, susceptible de influir en la conducta de los demás, y (c) que sea base de la confianza de otra parte que haya procedido de buena fe y que, por ello, haya obrado de una manera que le causaría un perjuicio si su confianza quedara defraudada.

Vivoni Farage v. Ortiz Carro, *supra,* págs. 1010-1011, citando a Int. General Electric v. Concrete Builders, *supra.* J. Puig Brutau, op. cit., pág. 112.

Cabe señalar que la doctrina de actos propios no es de aplicación general a las relaciones de partes privadas frente al gobierno. Únicamente "bajo circunstancias apropiadas, un demandante pued[e] invocar contra el Estado la doctrina de los actos propios, impedimento en equidad y de buena fe…". Berríos v. U.P.R., 116 D.P.R. 88, 98 (1985) (cita y nota al calce omitidas). Véase también

Hernández, Romero v. Pol. De P.R., 177 D.P.R. 121, 141 (2009).

Cónsono con lo anterior, se excluyen de su ámbito aquellas situaciones en las que se ven lesionados el interés y la política pública del Estado, así como los estatutos especiales promulgados en pro del orden público. Véase Quiles v. Del Valle, 167 D.P.R. 458, 478 (2006); Morales v. Municipio de Toa Baja, *supra*; J.R.T. v. Hosp. de La Concepción, 114 D.P.R. 372, 382-383 (1983).

Así, por ejemplo, en Morales v. Municipio de Toa Baja, *supra*, pág. 693, encontramos que "las violaciones a las leyes, política pública y orden público [eran] tan tajantes…, que no [existía] cabida para la aplicación de los principios de equidad. Resolver en otra forma sería propiciar el craso incumplimiento por los funcionarios públicos de las leyes y reglamentos que rigen sus actuaciones…". (Citas y nota al calce omitidas).

## B. Reglamentación de Tarifas

Consistentemente, hemos reiterado que el negocio de seguros se encuentra revestido de un alto interés público por el rol vital que juega esa industria tanto en nuestra sociedad como en nuestra economía. Maderas Tratadas, Inc. v. Sun Alliance Insurance Company, 2012 T.S.P.R. 101, 185 D.P.R. ___ (2012); Integrand Assurance Company v. CODECO, 2012 T.S.P.R. 59, 185 D.P.R. ___ (2012); S.L.G. Ortiz-Alvarado v. Great American, 182 D.P.R. 48 (2011). Ese

alto interés público al que se encuentra vinculado el negocio de seguros justifica, a su vez, la legislación que autoriza reglamentar las tarifas que le es permitido a las aseguradoras cobrarle a sus clientes. J. A. Appleman, Insurance Law and Practice, St. Paul, West Publishing Co., 1982, Vol. 19, sec. 10491, pág. 429.

El poder de reglamentar las tarifas en el campo de seguros tradicionalmente se ha asentado en la necesidad de reducir, en lo posible, el fracaso de empresas dedicadas a este tipo de negocio. Couch on Insurance 3d, ed. rev., West, 2009, Vol. 1, sec. 2.8, pág. 2-44. Se ha reconocido que la competencia destructiva de precios experimentada entre aseguradoras puede resultar en la insolvencia de algunas de ellas. S. Leibowitz, State Insurance Rate Regulation: a Coasian Perspective, 17 J.L. Bus. & Eth. 107, 108 (Winter 2011). No obstante, el enfoque de la reglamentación se ha movido para atender la exigencia de que las tarifas sean, a su vez, adecuadas desde el punto de vista del consumidor. La reglamentación de las tarifas persigue promover el bienestar social al impedir el uso de tasas excesivas, inadecuadas o injustamente discriminatorias. Couch on Insurance 3d, op. cit., sec. 2.31, pág. 2-134. Véase, además, J. A. Appleman, op. cit., sec. 10491, pág. 431.

Los Estados se encuentran facultados para escoger el método que consideren más adecuado para reglamentar y supervisar el negocio de seguros en su jurisdicción, con

el propósito de proteger el interés público, establecer tarifas uniformes, poner en vigor las leyes pertinentes y velar porque las violaciones a la legislación en el campo de seguros sean atendidas adecuadamente. Couch on Insurance 3d, op. cit., sec. 2.7, pág. 2-40. Así pues, en cada Estado la entidad reguladora asumirá una forma diferente y será dotada de facultades propias conforme le hayan sido conferidas por el estatuto orgánico correspondiente. Íd. pág. 2-41.

Nuestro ordenamiento dispone para la evaluación gubernamental de los tipos de seguros permitidos a las aseguradoras. La autoridad de validar las tarifas a utilizarse reside en el Comisionado de Seguros. Según expresamente consignado, el Capítulo 12 del Código de Seguros tiene como propósito fomentar el bienestar público a través de la reglamentación de tipos de seguros de modo que éstos no resulten "excesivos, inadecuados ni injustamente desiguales…". Art. 12.010 del Código de Seguros, 26 L.P.R.A. sec. 1201 (2008). Con el fin de viabilizar esta función reglamentaria, se implantó en Puerto Rico la exigencia de inscripción de tarifas mediante la cual se les exige a las compañías aseguradoras someter ante el Comisionado de Seguros las tarifas que se proponen utilizar para su evaluación, aprobación o modificación.

El Artículo 12.050 del Código de Seguros, *supra,* específicamente, establece los requisitos para la

inscripción de tipos y, en lo pertinente a este recurso, dispone:

> (1) Todo organismo tarifador y todo asegurador autorizado deberá inscribir ante el Comisionado, antes de usarlos en Puerto Rico, excepto como se dispone en la sec. 1209 de este título, cada manual de tipos, listas de tipos, clasificación de riesgo, plan tarifario, programa de líneas múltiples según definido mediante reglamentación y cualquier otra regla de tipos que adoptare o usare, así como cualquier otra información concerniente a la aplicación y cómputo de los tipos que fija y use, y toda modificación de cualquiera de los anteriores que se proponga usar….
>
> Un asegurador podrá cumplir con su obligación de presentar tales tipos para cualquier clase o tipo de seguro, haciéndose miembro o suscriptor de un organismo tarifador que los haga para tal caso o tipo de seguro, y autorizando al Comisionado a aceptarlos del organismo tarifador en nombre de dicho asegurador. Disponiéndose, que en el caso de seguro de propiedad, el asegurador deberá hacerse miembro o suscriptor de un organismo tarifador autorizado a presentar los tipos de dichos seguros ante el Comisionado.
>
> ….

Una vez sometida la inscripción, corresponde entonces al Comisionado de Seguros evaluar las tarifas propuestas dentro de un periodo inicial de treinta (30) días, prorrogable a sesenta (60) días adicionales. No obstante, la inscripción no surtirá efecto hasta que haya concluido el plazo dispuesto para su revisión. Art. 12.060(2)(a) del Código de Seguros, 26 L.P.R.A. sec. 1206(2)(a). Se considerará que la presentación sometida cumple con los requisitos estatutarios, a menos que ésta sea denegada

durante el periodo antes señalado.   Art. 12.060(3) del Código de Seguros, 26 L.P.R.A. sec. 1206(3).

Igualmente, se le concede al Comisionado la potestad de desreglamentar las tarifas a ser utilizadas por las compañías aseguradoras.   El procedimiento a seguir para cumplir con este propósito surge, específicamente consignado, en el Artículo 12.080 del Código de Seguros, el cual dispone lo siguiente:

> El Comisionado podrá **suspender o modificar con arreglo a las reglas y reglamentos que adopte, o mediante orden el requisito de presentación** en cuanto a cualquier clase de seguro, subdivisión o combinación del mismo, o en cuanto a clases de riesgos para los cuales los tipos prácticamente no pueden presentarse antes de usarse o en cuanto a las clases de seguros para los cuales un estatuto federal no requiera tal presentación. **Dichas órdenes, reglas o reglamentos serán dados a conocer a los aseguradores y organismos afectados.** El Comisionado podrá llevar a cabo investigaciones que considere conveniente, para determinar si los tipos afectados por dicha orden reúnen los requisitos de la sec. 1204(1)(b) [y] (c) de este título.

26 L.P.R.A. sec. 1208 (2008) (énfasis nuestro) (Artículo 12.080 del Código de Seguros).

### C. Procedimiento Sumario

Excepto que su ley orgánica disponga lo contrario, la Ley Núm. 170 de 12 de agosto de 1988, según enmendada, conocida como Ley de Procedimiento Administrativo Uniforme de Puerto Rico (LPAU), 3 L.P.R.A. secs. 2101 *et seq.* (2004), faculta a las entidades administrativas a disponer de los asuntos ante su consideración mediante resolución

sumaria. Sección 3.7(b) de la LPAU, 3 L.P.R.A. sec. 2157(b) (2011).[6] Este mecanismo persigue agilizar el proceso adjudicativo en casos en que no estén presentes hechos materiales en controversia. Comisionado Seguros P.R. v. Integrand, 173 D.P.R. 900 (2008). "Nada impide que [una agencia] pueda adjudicar sin celebrar una vista evidenciaria cuando no exista controversia sobre los hechos y, además, toda la evidencia documental que surge del expediente señale *claramente* la corrección de la determinación de la agencia…". Mun. de San Juan v. CRIM, 178 D.P.R. 163, 179 (2010) (énfasis en el original). De este modo se evita el tener que celebrar una "audiencia evidenciaria [que] no aportaría ningún elemento meritorio al proceso analítico…." J. Echevarría Vargas, Derecho Administrativo Puertorriqueño, San Juan, Ediciones Situm, 2012, pág. 231.

### D. Revisión Administrativa

La revisión de las determinaciones administrativas está basada en el principio de deferencia judicial. Mediante esta norma reconocemos el *expertise* del que gozan los organismos administrativos en aquellas materias que le han sido delegadas por ley. Frías v. Gobierno Municipal Autónomo de Carolina, 2012 T.S.P.R. 98, 185 D.P.R. ___ (2012); Batista de Nobbe v. Junta de Directores del

---

[6] En Comisionado Seguros P.R. v. Integrand, 173 D.P.R. 900 (2008), resolvimos que la Oficina del Comisionado de Seguros (OCS) está facultada para valerse de esta vía procesal cuando no medien controversias de hechos materiales.

Condominio Condado Terrace, 2012 T.S.P.R. 63, 185 D.P.R. ___ (2012); Ifco Recycling, Inc. v. Autoridad de Desperdicios Sólidos, 2012 T.S.P.R. 35, 184 D.P.R. ____ (2012); Torres Santiago v. Depto. Justicia, 181 D.P.R. 969 (2011).

Conforme provisto en la Sección 4.5 de la LPAU,[7] no intervendremos con las determinaciones de hechos formuladas por una agencia, siempre que éstas se encuentren sustentadas por evidencia sustancial que forme parte del expediente administrativo. *A contrario sensu*, las conclusiones de derecho de un ente administrativo podrán ser examinadas por el foro judicial en todos sus aspectos. Frías v. Gobierno Municipal Autónomo de Carolina, *supra*; Batista de Nobbe v. Junta de Directores del Condominio Condado Terrace, *supra*; Ifco Recycling, Inc. v. Autoridad de Desperdicios Sólidos, *supra*; Torres Santiago v. Depto. Justicia, *supra*.

"La deferencia reconocida a las decisiones de las agencias administrativas habrá de ceder, solamente, cuando la misma no esté basada en evidencia sustancial, cuando la agencia ha errado en la aplicación de la ley y cuando su actuación resulte ser una arbitraria, irrazonable o ilegal…." Frías v. Gobierno Municipal Autónomo de Carolina, *supra* (énfasis omitido); Torres Santiago v. Depto. Justicia, *supra*.

---

[7]    3 L.P.R.A. sec. 2175 (2011).

**III**

Universal sostiene que, mediante sus expresiones y acciones, el Comisionado García creó la apariencia de la desreglamentación de las tarifas a base de lo cual, y procediendo de buena fe, negoció con sus clientes. Por tanto, argumenta que le está vedado al Comisionado de Seguros de turno ir en contra de dichas representaciones. Alega, además, que las actuaciones de los comisionados subsiguientes le han expuesto a un perjuicio económico.

Para sustentar su posición, acompañó sus escritos sometidos ante la agencia administrativa con copia de artículos de periódicos y comunicaciones de la OCS alusivos al tema. Igualmente, sometió una "Declaración Jurada" suscrita por el Comisionado Auxiliar Ramón L. Cruz Colón (Comisionado Auxiliar Cruz), quien ocupó dicho puesto en la OCS desde mediados del 1997 hasta marzo de 2001. En ésta indica que, mientras el Comisionado García ocupó su cargo, en reiteradas ocasiones manifestó su interés en desreglamentar el mercado de seguros comerciales en Puerto Rico. Esto es, permitir a las aseguradoras cobrar las primas que estimasen convenientes sin necesidad de adherirse a las tarifas sometidas y aprobadas por la OCS. Igualmente, expresó que el Comisionado García había dado a conocer su intención de no fiscalizar la práctica, que para entonces alegadamente era común entre las aseguradoras, de otorgar descuentos no

contemplados en los manuales de tarifación vigentes mientras formalizaba la aludida desreglamentación. A esos efectos, el Comisionado García inicialmente le solicitó al Comisionado Auxiliar Cruz trabajar en un anteproyecto de ley para modificar el Capítulo 12 del Código de Seguros y, posteriormente, le requirió preparar el correspondiente proyecto de reglamentación.

Teniendo como cierta la documentación que consta en autos, no cabe duda de que el Comisionado García, tanto en privado como en público, reveló "su intención de desreglamentar el mercado de seguros comerciales en Puerto Rico". Es decir, favoreció la libre competencia como mecanismo tarifario por encima del requisito estatutario de aprobación previa. Su filosofía, basada en la liberalización del mercado, proponía que al disputarse los clientes entre sí las aseguradoras ajustarían los precios de sus primas a favor del consumidor.

No obstante, acorde a la propia evidencia sometida por Universal, el Comisionado García estaba consciente de que establecer el sistema de libre competencia, conforme a lo dispuesto en el Artículo 12.080 del Código de Seguros, requería "suspender o modificar con arreglo a las reglas y reglamentos que adopte, o mediante orden el requisito de presentación" implantado por el Capítulo 12 del Código de Seguros, el cual regía entonces y aún continúa en vigor, y exige que las tarifas sean sometidas previamente para su aprobación. Ese Artículo exige, a su vez, que cualquier

orden, regla o reglamento a esos efectos tiene que ser informada por la OCS a las aseguradoras. A base de la Declaración Jurada sometida por Universal, podemos deducir que con este propósito el Comisionado García gestionó, a través del Comisionado Auxiliar Cruz, la redacción de un anteproyecto y la reglamentación correspondiente. Sin embargo, durante la incumbencia del Comisionado García, nunca se efectuó el cambio deseado mediante orden, reglamento o enmienda alguna al Código de Seguros.

Igualmente, la evidencia apunta a que el Comisionado García tenía conocimiento de que, en efecto, muchas aseguradoras no se estaban adhiriendo a las tarifas en vigor. Sin embargo, optó por no implantar las disposiciones del Código de Seguros que penaliza esta práctica, mientras procuraba lograr los cambios correspondientes al ordenamiento vigente. Así lo reconoce el Comisionado Auxiliar Cruz en su Declaración Jurada al manifestar lo siguiente: "[a] la vez, señaló el [Comisionado] García que la OCS no estaba fiscalizando dicha situación y que permanecería sin fiscalizarla **mientras procedía con el desarrollo de la reglamentación necesaria para formalizar la referida desreglamentación en Puerto Rico…."** (Énfasis nuestro).

Sobre este particular, encontramos reveladora la consulta propuesta por Ace Insurance Company (AIC) a la

OCS en febrero de 2000[8] y la contestación de esta última fechada el 26 de abril de 2000,[9] específicamente, en torno al requisito de un trámite formal para poder viabilizar la desreglamentación sometida en autos por Universal. Cabe notar que, en su comunicación, AIC da por sentado que debe existir algún tipo de notificación de parte de la OCS y enmendarse el estado de derecho vigente para poder implantar el sistema de libre competencia.

En su respuesta a AIC, el Comisionado García reconoce la necesidad de una acción formal de su parte para lograr el nuevo enfoque. De igual forma admite la práctica de las aseguradoras de no adherirse a los tipos registrados en la OCS y **no descarta** la posibilidad de que éstas se hallen incursas en violación de ley. De otra parte, simplemente propone la posibilidad de que el beneficio redundante al consumidor, como resultado de la competitividad en el mercado, se considere como una circunstancia mitigante a la pena a ser impuesta por dicha infracción.

En síntesis, conforme surge de los autos, la filosofía del Comisionado García, para la época objeto de las penalidades envueltas en este recurso, se centró en gestionar la desreglamentación oficial con el propósito de liberalizar el sistema tarifario en el campo de los

---

[8]     Petición de *Certiorari*, Apéndice, pág. 142.

[9]     Petición de *Certiorari*, Apéndice, pág. 140.

seguros en Puerto Rico. Cónsono con este enfoque optó, entre tanto, por ejercer su discreción al no poner en vigor las disposiciones del Código de Seguros sobre este particular. No obstante, bajo el mandato del Comisionado García en ningún momento quedó sin efecto el requisito de aprobación previa de tarifas según consignado en el Capítulo 12 del Código de Seguros. Simplemente, durante ese periodo en particular, se dio la práctica administrativa de no poner en vigor la normativa vigente.

Ciertamente aparecieron publicadas en la prensa múltiples manifestaciones del Comisionado García haciendo referencia a la desreglamentación del mercado y al hecho de que las aseguradoras se estaban apartando de las tarifas anteriormente aprobadas por la OCS. Igualmente, ello se encuentra sustentado por las declaraciones del Comisionado Auxiliar Cruz que obran en el expediente. No obstante, la ley es clara a los efectos de que, excepto que medie una enmienda al propio estatuto, la modificación o eliminación de las tarifas debe venir acompañada de una actuación formal por parte de la OCS, ya sea a través de una orden o reglamento. Dicha determinación, a su vez, debe ser debidamente notificada a las partes afectadas lo que necesariamente implica las aseguradoras.

En el contexto de este caso, no nos parece razonable el que Universal descansara enteramente en expresiones verbales del Comisionado García atinentes a la desreglamentación sin ocuparse de verificar si dicha

posición estaba sustentada, ya fuese por una enmienda a las disposiciones del Código de Seguros o por alguno de los mecanismos provistos en el Artículo 12.080 del mismo.

El mero hecho de que un oficial público haga expresiones sobre un alegado estado de derecho no releva a la parte afectada de hacer gestiones claramente a su alcance para cotejar su certeza. No podemos olvidar que se trata de una aseguradora que, por la naturaleza altamente reglamentada del negocio al cual se ocupa, viene obligada a estar al tanto de las tarifas en efecto para sus productos, así como el procedimiento exigido en ley para la dispensa de éstas. En otras palabras, ésta se considera conocedora del imperativo estatutario provisto en el Artículo 12.080 del Código de Seguros el cual dispone, como requisito esencial para el relevo de presentación de tarifas, que medie ya sea una orden escrita o reglamentación que así lo acredite.

Más aún, la obligación de notificar cualquier exención atinente a las tarifas "a los aseguradores y organismos afectados" consta taxativamente como parte del Artículo 12.080 del Código de Seguros. Por ende, Universal debía conocer que cualquier cambio tarifario efectuado por el Comisionado de Seguros a tenor con esta disposición estatutaria le hubiese sido informado por la OCS.

Por otro lado, declinamos emplear la doctrina de actos propios en este caso. Reiteramos, de este modo, el

principio de la aplicación limitada de esta norma de equidad frente al Estado disponible, únicamente, por vía de excepción y en circunstancias de naturaleza única.

En términos procesales, entendemos que actuó correctamente la OCS al resolver el caso mediante la vía sumaria. Conforme la investigación realizada por la OCS en el caso de autos, durante el periodo en cuestión Universal cobró primas de seguros de propiedad para condominios que estaban ya fuese por encima o por debajo de las registradas en la OCS. Este hecho resulta irrefutable de la prueba sometida por la OCS en el procedimiento adjudicativo.

Surge claramente de los autos que la prueba utilizada por la OCS para sustentar las alegadas violaciones al Código de Seguros descansa, esencialmente, en información sometida por la propia peticionaria como parte del proceso de investigación iniciado por la OCS, relativo a las primas cobradas por Universal a sus clientes en el periodo de tiempo antes señalado. Una vez sometida la información por Universal, las primas fueron comparadas con las tarifas que la agencia entendía continuaban en vigor.[10]

Ante este escenario fáctico, no existía razón alguna para la OCS llevar a cabo algún tipo de proceso evidenciario.

---

[10]     La información pertinente a la diferencia entre las primas cobradas por Universal y las tarifas aprobadas por la OCS aparece detallada en los Anejos I y II de la Orden de 8 de mayo de 2002, así como en los Anejos 1 y 2 de la "Moción para que se Dicte Resolución Parcial Sumaria" sometida por la OCS. También se recoge, a su vez, en los dictámenes de la OCS aquí recurridos.

**IV**

A base de lo antes expuesto, resolvemos que la determinación de la Oficina del Comisionado de Seguros de 7 de diciembre de 2007 no resulta arbitraria o irrazonable y la misma se encuentra sustentada en derecho. Por consiguiente, se confirma la Sentencia del Tribunal de Apelaciones.

Se dictará Sentencia de conformidad.


                          ROBERTO FELIBERTI CINTRÓN
                                Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| COMISIONADO DE SEGUROS DE PUERTO RICO<br><br>Recurrido<br><br>v.<br><br>UNIVERSAL INSURANCE COMPANY, INC.<br><br>Peticionaria | **Núm.: <u>CC-2010-0413</u>** | *Certiorari* |

**SENTENCIA**

En San Juan, Puerto Rico, a 1 de noviembre de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, resolvemos que la determinación de la Oficina del Comisionado de Seguros de 7 de diciembre de 2007 no resulta arbitraria o irrazonable y la misma se encuentra sustentada en derecho. Por consiguiente, se confirma la Sentencia emitida por el Tribunal de Apelaciones.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. La Jueza Asociada señora Fiol Matta no intervino.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo